DEPOSITION OF JULIA CARTER
CONDUCTED ON MONDAY, MARCH 12, 2007

1 (Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------x
ANTOINETTE M. PARKER, et al.:
    Plaintiffs        :
v.              :  1:05-cv-01782
GEORGE E. HOLLAND, et al.  :
    Defendants       :
--------------------------x

Deposition of JULIA CARTER
Washington, D.C.
Monday, March 12, 2007
12:26 p.m.

Job No.: 1-99105
Pages: 1 - 82
Reported by:  Linda Bahur, RPR

---

**Page 2**

Deposition of JULIA CARTER, held at:
Bonner Kiernan Trebach & Crociata, LLP
1233 20th Street
Suite 800
Washington, D.C.  20036

Pursuant to agreement, before Linda M. Bahur, Registered Professional Reporter and Notary Public of the State of Maryland.

---

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
    WILLIAM BUTLER, ESQUIRE
    THOMAS V. MILLER, JR., P.A.
    8808 Old Branch Avenue
    P.O. Box 219
    Clinton, Maryland  20735
    (301) 856-3030

ON BEHALF OF DEFENDANT RARDIN ENTERPRISES:
    D'ANA JOHNSON, ESQUIRE
    KIERNAN, BONNER
    1233 20th Street, N.W.
    Suite 800
    Washington, D.C.  20036
    (202) 712-7000

Also present:  David Rardin

---

**Page 4**

CONTENTS

EXAMINATION OF JULIA CARTER                PAGE
by Mr. Butler                    5
by Mr. Butler (resumed)          47
by Ms. Johnson                   76
by Mr. Butler                    78

EXHIBITS
(No exhibits marked)

EXHIBIT
A
tabbies

---

DEPOSITION OF JULIA CARTER
CONDUCTED ON MONDAY, MARCH 12, 2007

4 (Pages 13 to 16)



13

1  night, September 15, 2004, when this incident
2  happened?
3      A  Yes, sir.
4      Q  And by incident, I'm referring to between Mr.
5  Holland and the Parkers.
6      A  Yes, sir.
7      Q  And you were working as a swing manager that
8  night?
9      A  I was a manager, yes, sir.
10     Q  Do you know what your hours would have been
11  that night?
12     A  We come in from three to close.
13     Q  Okay.  And on average, what time do you
14  close?
15     A  The store close up at 11.
16     Q  Eleven p.m.  Okay.  And Mr. Holland was also
17  working that night, September 15, 2004, the night of
18  the incident?
19     A  Yes, sir.
20     Q  Do you know what his hours would have been?
21     A  He came in at four.
22     Q  Four to close?
23     A  Yes, sir.
24     Q  And that night, September 15, 2004, do you
25  know what his job would have been?

14

1      A  He's in the grill area.
2      Q  So he's a grill worker?
3      A  Yes, sir.
4      Q  And what does the grill worker do?
5      A  Prepare food.
6      Q  And what do they use to prepare food?  What
7  sort of instrument or instruments do they use to
8  prepare the food?
9      A  We have spatulas.  That's take the meat off
10  the grill.  We have tongs to pick the meat up, put on
11  the sandwiches.
12     Q  Okay.  Anything else?
13     A  No, sir.
14     Q  Okay.
15     A  We wear gloves.
16     Q  Do they have any knives in the store?
17     A  No, sir.
18     Q  There's not any knives anywhere in the store?
19     A  All we have is plastic knives with the salads
20  with the box.
21     Q  So it's your testimony that there aren't any
22  knives in the McDonald's store whatsoever?
23     A  No, sir.  No, it's not.
24     Q  Yes, that's your testimony?
25     A  Yes.

15

1      Q  No, there's not any knives?  Okay.  Do you
2  recall who else was working that night?
3      A  No, sir.
4      Q  Do you recall if there should have been other
5  people working that night?
6      A  There's some more people working there.
7  Yes.
8      Q  How many and what would their titles have
9  been?
10     A  One in drive-through and two in the grill
11  counting myself.
12     Q  Okay.  Counting yourself and Mr. Holland?
13     A  Yes.
14     Q  So maybe one other grill person besides Mr.
15  Holland?
16     A  Yes.
17     Q  One drive-through, this manager.  That's
18  four.
19     A  Uh-huh.
20     Q  Is that enough to run the night shift?
21     A  Yes, sir.
22     Q  Okay.  Do you recall specifically whether or
23  not there were, indeed, that night, September 15,
24  2004, yourself, Mr. Holland, we know.  Do you know if
25  there was another grill person that night?

16

1      A  It was.
2      Q  There was?
3      A  (Nodding).
4      Q  Do you know if there was a drive-through
5  worker that night?
6      A  Yes, sir.
7      Q  Do you know if there were any other workers
8  that night other than those four?
9      A  That's it.
10     Q  And do you recall who the drive-through
11  person was?
12     A  I can't remember the name.
13     Q  Do you recall who the other grill person was?
14     A  No, sir.
15     Q  Mr. Rardin was telling me about a packet that
16  employees are given when they apply to McDonald's.
17     A  Yes.
18     Q  Were you given such a packet?
19     A  Yes.
20     Q  And does that packet have all the rules and
21  regulations of McDonald's in it?
22     A  Yes, sir.
23     Q  Okay.  And you sign a statement, I guess,
24  saying that you read and understand the whole
25  packet?

**21**

1    Q  And where do you put them?

2    A  **We talk to them especially if they've been**
3  **very nasty to a customer.  I always send them home.**

4    Q  And what do you consider very nasty to a
5  customer?

6    A  **Cussing.  When I ask them to be quiet, they**
7  **keep on talking.**

8    Q  So your options are to pull them off the
9  front line?

10    A  **Yes, I would pull them off the front line.**

11    Q  Talk to them?

12    A  **Talk to them.**

13    Q  If it's serious enough --

14    A  **If it's serious enough, they will go home.**

15    Q  Okay.  Do you know of any other actions that
16  you're allowed to take or should take with regard to
17  your employees if they mistreat a customer?

18    A  **Yes, send them home.**

19    Q  Send them home?  Okay.  What if they're not
20  on the front line?  What if they're --

21    A  **If they're in the gray area, drive-through,**
22  **lobby.**

23    Q  Right.  It doesn't matter?

24    A  **It doesn't matter.  They go home.**

25    Q  Now, do they always go home?  Or can you talk

**22**

1  to them and if they change their behavior, they can
2  stay?

3    A  **If they have a nasty attitude, yes, they're**
4  **going home.**

5    Q  Now, are you, do you have at McDonald's a
6  manual that you, tells you how to behavior in these
7  situations or is this just based on the training that
8  you attend?

9    A  **In that little booklet that you get when you**
10  **are first hired, it tells you everything.  How to**
11  **treat customers, what McDonald's expect of you.  The**
12  **customer is always right.**

13    Q  When you say booklet, what are you talking
14  about?

15    A  **It's a little, thick gray book that all**
16  **employees get when they're first hired.**

17    Q  Okay.  And it's my understanding that your
18  attorney has a copy of that and they might, they would
19  probably make that available to us once we sign the
20  order.

21    MS. JOHNSON:  Why don't we just have her
22  identify it if this is what she's talking about.  Is
23  this what you're talking about?

24    THE WITNESS:  Yes.

25    MR. BUTLER:  All right.  This is more of a

**23**

1  folder?

2    MR. JOHNSON:  Yes.  I told you that.

3  BY MR. BUTLER:

4    Q  So it's not a bound red book or is there --
5  oh, there are some pamphlets and stuff in there.
6  That's given to?

7    A  **All the employees.**

8    Q  All new employees?

9    A  **Yes.**

10    Q  And we talked about that before.  We're going
11  to try to get a copy of that packet.  Okay.  Now, you
12  were the manager that night?

13    A  **Yes.**

14    Q  Okay.  And you still work as a manager there?

15    A  **Yes.**

16    Q  And we'll get to the specific incident, okay,
17  in a moment.

18    A  **Okay.**

19    Q  My understanding is there are security
20  cameras onsite?

21    A  **Yes, sir.**

22    Q  Okay.  And those can be viewed in the
23  manager's office?

24    A  **Yes, sir.**

25    Q  What do those cameras show you?

**24**

1    A  **They show everything.**

2    Q  And when you say everything, what --

3    A  **They show the front line, drive-through,**
4  **then the lobby part where the customers come in.**

5    Q  Where is that?  Where do the customers come
6  in?

7    A  **We have a side door right here and then we**
8  **have a side door right here.  Customer can come in**
9  **this way and that way.**

10    Q  Okay.  One of the side doors is near the
11  drive-through?

12    A  **This is by the drive-through, yes, and this**
13  **is where the customers' cars be parked at in the**
14  **parking lot.**

15    Q  And you're motioning to your left and right
16  because you're viewing it from behind the counter?

17    A  **Yes.**

18    Q  If I was facing the counter, the
19  drive-through would be on my left?

20    A  **Yes.**

21    Q  Okay.  And there would be an exit there?

22    A  **Yes.**

23    Q  And the opposite side would be another
24  parking lot?

25    A  **The parking lot.**

DEPOSITION OF JULIA CARTER
CONDUCTED ON MONDAY, MARCH 12, 2007

7 (Pages 25 to 28)

25

1    Q    And then also a bathroom in the back of the
2  store?
3    A    It's down the hall.
4    Q    So it's your understanding that, and this is,
5  hasn't changed since December '03 up until now that
6  there's cameras that show you the exits?
7    A    The cameras had changed.
8    Q    Okay. Well, that's what we need to get at.
9  Let me be more specific. Back in September 15, 2004,
10  what did the cameras show you?
11    A    They show you the front line.
12    Q    Front line, when you say that, you mean the
13  cashier area?
14    A    The cashier area and the drive-through area.
15    Q    Okay. What about the drive-through area?
16    A    It show the drive-through area, too.
17    Q    The car or the person standing at the window?
18    A    We have a little monitor t.v., I call it
19  little t.v., and it shows that the cars, when they
20  drive up by the sign to place their order, and then it
21  show when the cashier, drive-through cashier is taking
22  money.
23    Q    Okay. And then there's one on the front
24  line; you said the cashier in the store?
25    A    Yes. Showing the cashier checking the money.

26

1    Q    There's two cameras. This is as of September
2  15, 2004. Are there any other cameras other than
3  those two?
4    A    In the office.
5    Q    So it's a camera showing you the office?
6    A    Uh-huh.
7    Q    And are there any other cameras at that time?
8    A    No.
9    Q    September 15, 2004?
10    A    No, but the camera that's showing the cashier
11  shows the door to the customers coming in.
12    Q    Okay. So which door is that? The one near
13  the drive-through or the one on the other side?
14    A    We had two. Camera here and camera there.
15    Q    So you could see both doors?
16    A    Yes.
17    Q    So what can you see in the doors?
18    A    Customer into the store.
19    Q    If you're looking into the camera, you can
20  see when they get into the store? Explain that to me.
21    A    When they into the side of the store, we can
22  see the customers coming inside the store. When they
23  coming into the door, we can see them on camera.
24    Q    On camera. Okay. The door, the exit, when
25  you exit the door from the inside, do you immediately

27

1  get outside or is there, like, a little hallway?
2    A    It's a little breezeway and then the next
3  door will take you outside.
4    Q    The next door takes you outside?
5    A    Yes. There's a tear here and then we got a
6  breezeway and then the door will take you outside.
7    Q    Can you, from the cameras, at least as of
8  September 15, 2004, can you see the people coming
9  through the outside door?
10    A    Not on the outside door. No.
11    Q    No? Just the next door from the breezeway,
12  you called it, into the door?
13    A    Just from the breezeway into the store.
14    Q    You can see the, from the atrium
15  opening the door that gets them into the dining area?
16    A    Yes.
17    Q    Okay. Now, are there policies in place for
18  reviewing the tapes or pulling the tapes from the
19  cameras?
20    A    The store manager have to do that.
21    Q    And who is that at the time, September 15,
22  2004?
23    A    David Claybrooks.
24    Q    That's not something that the swing manager
25  could do?

28

1    A    No. The store manager and the assistant
2  manager only one can do that.
3    Q    Who is the assistant manager?
4    A    If I'm not mistaken, I think her same was Kim
5  at that time.
6    Q    At that time? But she's below Mr.
7  Claybrooks?
8    A    Yes. Mr. Claybrooks is a store manager.
9    Q    So the store manager is the highest, then
10  the assistant manager, possibly Kim at the time, --
11    A    Yes.
12    Q    -- September 15, 2004, then the swing manager
13  would be below the assistant manager?
14    A    Yes.
15    Q    Okay. In this particular night, do you know
16  if the tape was pulled after this incident with
17  Mr. Holland on September 15, 2004?
18    A    I do not know, sir.
19    Q    Okay. Did you report the incident, September
20  15, 2004, to Mr. Claybrooks?
21    A    Yes, I did.
22    Q    When did you report that?
23    A    Right after police came and I called David at
24  his house and told him what was going on.
25    Q    Now, the incident happened at 9:30 p.m.

DEPOSITION OF JULIA CARTER
CONDUCTED ON MONDAY, MARCH 12, 2007

9 (Pages 33 to 36)

---

**33**

1  not they do any background checks on potential
2  employees?
3  　　　MS. JOHNSON: I'm sorry. What was the
4  question again? I'm sorry.
5  　Q  Since December 2003 up until you've been
6  working there as a swing manager, are you aware that
7  they do any background checks on any potential
8  employees?
9  　　　MS. JOHNSON: Objection to form. Vague.
10 　Q  You can answer.
11 　A  No.
12 　Q  You're not aware?
13 　A  No. I mean, no.
14 　Q  No?
15 　A  No.
16 　Q  I'm sorry?
17 　A  Not from my knowledge.
18 　Q  Well, they ask them this question on the
19 employment application?
20 　A  Uh-huh. Yes.
21 　Q  Do they do anything other than that? You
22 know, do they check the courthouse records or do they
23 go on the computer or anything like that to check on
24 people?
25 　A  Unless the store manager do that. I'm not

---

**34**

1  really sure.
2  　Q  You're not aware of that? All right.
3  September 15, 2004, you've already testified you were
4  there as a swing manager that night?
5  　A  Yes.
6  　Q  Okay.
7  　　　(Break taken from 1:05 to 1:08 p.m.)
8  　Q  Okay. You started the New York Ave. December
9  of 2003?
10 　A  Yes.
11 　Q  Okay. You worked as a swing manager. At
12 some point, Mr. Holland started working the same shift
13 as you, the night shift?
14 　A  Yes, sir.
15 　Q  Do you remember that, when that was?
16 　A  No, sir.
17 　Q  Okay. Do you remember -- the incident
18 happened September 15, '04. Do you remember for how
19 long you had worked the night shift together before
20 that happened?
21 　A  Quite a while.
22 　Q  In that quite a while before September 15,
23 2004, do you recall ever having any problems with Mr.
24 Holland?
25 　A  No.

---

**35**

1  　Q  Do you recall before September 15, 2004 ever
2  having to make any notations in the computer about Mr.
3  Holland?
4  　A  No, sir.
5  　Q  Would that have been your job as a swing
6  manager to make notations in the computer?
7  　A  If we had -- want me to wait until she comes
8  back?
9  　Q  Yes. It was your job to make comments on the
10 computer if employees did not behave appropriately?
11 　A  Yes. We have access to the computers. If we
12 have any problems with any employee, we can write them
13 up in the computer.
14 　Q  And you never did that for Mr. Holland?
15 　A  No, sir.
16 　Q  Do you recall when the Parkers entered the
17 store?
18 　A  Yes, sir.
19 　Q  Okay. Do you recall what time of night that
20 was?
21 　A  I'm not quite sure, sir.
22 　Q  And when they entered, who was it? Was it
23 two people?
24 　A  It was a husband, I guess it was a husband
25 and wife.

---

**36**

1  　Q  Couple?
2  　A  Couple, yes.
3  　Q  And do you recall what they looked like?
4  　A  She was light-skinned. She had her hair
5  down. He was kind of light-skinned. Had a shirt and
6  tie on, dress pants.
7  　Q  And when they walked in the store, do you
8  recall what they did?
9  　A  They waited in line waiting to be helped.
10 　Q  You recall there was a line at the time?
11 　A  It was another person in front of them, yes.
12 Another customer.
13 　Q  Okay. And do you recall who was working the
14 counter?
15 　A  I was.
16 　Q  You were? So you were working the cashier on
17 the front line?
18 　A  Yes.
19 　Q  And they're waiting in line. At this point,
20 they had walked in the door and they were waiting in
21 line?
22 　A  Yes.
23 　Q  Had anything happened up to that point?
24 　A  No, sir.
25 　Q  What happens next?

---



My signature below certifies that I have fully read and completely understood the rules and policies set forth by McDonald's Restaurant. I agree to abide by each of them, and understand that failure to do so, could result in suspension and/or termination.

Signature *Gloryl Holbd*

Date    8-9-02

## ATTACHED POLICIES:

- 90-Day Trial Period
- Non-Discrimination and Sexual Harassment
- Cash Register
- Employee Meal
- Dating of Employees
- General Rules and Policies



EXHIBIT

B

Like any organization, your independent McDonald's franchisee has rules of conduct. The following rules are examples of our expectations, but are not all-inclusive. Violations of business policies may result in discipline to be determined by your management team or owner/operator.

## McDonald's
## General Rules and Policies

1.    Letting someone in/out of the store before open or after close.

2.    Being late for work.

3.    No show no call to immediate supervisor

4.    Alcohol, drugs, weapons on property

5.    Theft of product

6.    Theft of monies/gift certificates

7.    Sexual Harassment — Zero tolerance

8.    Report accidents/injuries immediately

9.    Derogatory statement to crew or other managers

10.   Use of profanity on McDonald's property

11.   Fighting in the store or causing a disturbance

12.   Do not use tobacco or chew gum while you are working

13.   Do not allow anyone besides yourself to clock you in or out. Inform manager before clocking in or out.

14.   Request permission from the manager before using the telephone. Our phone are business use only. No long distance calls.

15.   Do not post anything on a crew bulletin board without Store Manager's approval.

16.   Do not bring valuable personal belongings or large amounts of cash to work. We are not responsible for your personal belongings.

17.   Do not ask to receive your paycheck early or to have a personal check cashed. Only the named employee will be allowed to sign for their paycheck.

18.   Loans — Loaning of money from managers to crew or crew to managers is strictly prohibited. ** We cannot advance you pay for hours worked. You must wait for payday.

19.   Do not take free food without your managers approval. Do not give free food to anyone including your friends.

      ** Note: If a customer asks you for free food, immediately inform the shift or service manager. The manager will handle the situation. Do not give away free food under any circumstance, without managers approval (ie, customer complaints).

20.   Dating a fellow crew member is acceptable as long as it does not interfere with restaurant operations. Under no circumstance can a manager and crew, from the same store, date or fraternize.

21.   Giving false information on the employment application or during the application process is forbidden.

22.   Theft, misuse, defacement or destruction of company property is prohibited.

23.   Abusive or threatening behavior towards any employee or customer is prohibited.

24.   Minimum jewelry & cosmetics. No beard. Hair in hat or hairnet.

**Failure to follow these rules could be grounds for termination.**

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

1 (Pages 1 to 4)

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3  ------------------------------x
4  ANTOINETTE M. PARKER, et al.:
5      Plaintiffs  :
6  v.    : l:05-cv-01782-EGS
7  GEORGE E. HOLLAND, et al.  :
8      Defendants  :
9  ------------------------------x
10      Deposition of DAVID RARDIN
11      Washington, D.C.
12      Monday, March 12, 2007
13      10:40 a.m.
14
15
16
17
18
19
20
21
22
23  Job No.: 1-99105
24  Pages: 1-72
25  Reported by:  Linda Bahur, RPR

---

**Page 2**

1      Deposition of DAVID RARDIN, held at:
2      Bonner Kiernan Trebach & Crociata, LLP
3      1233 20th Street
4      Suite 800
5      Washington, D.C.  20036
6
7
8
9      Pursuant to agreement, before Linda M.
10  Bahur, Registered Professional Reporter and Notary
11  Public of the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1      A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3      WILLIAM BUTLER, ESQUIRE
4      THOMAS V. MILLER, JR., P.A.
5      8808 Old Branch Avenue
6      P.O. Box 219
7      Clinton, Maryland  20735
8      (301) 856-3030
9
10  ON BEHALF OF DEFENDANT RARDIN ENTERPRISES:
11      D'ANA JOHNSON, ESQUIRE
12      BONNER KIERNAN TREBACH & CROCIATA, LLP
13      1233 20th Street, N.W.
14      Suite 800
15      Washington, D.C.  20036
16      (202) 712-7000
17
18
19
20
21
22
23
24
25

---

**Page 4**

1      C O N T E N T S
2  EXAMINATION OF DAVID RARDIN    PAGE
3  by Mr. Butler    5
4
5
6
7
8
9      E X H I B I T S
10      (Retained by Ms. Johnson)
11
12  EXHIBIT    PAGE
13  1  McDonald's General Rules and Policies    34
14  2  McDonald's application of Mr. Holland    50
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT
C

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

2 (Pages 5 to 8)

---

**5**

1    PROCEEDINGS
2  Thereupon ---
3        DAVID RARDIN
4  having been duly sworn, testified as follows:
5      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:
6  BY MR. BUTLER:
7    Q  Mr. Rardin, good morning to you.  My name is
8  William Butler.  I'm here on behalf of the plaintiffs
9  in this case, Antoinette Parker and her husband, Mr.
10 Parker.  I'm going to be taking your deposition today.
11 Have you ever had your deposition taken before?
12   A  Never.
13   Q  Okay.  Just a couple things.  If for any
14 reason you don't understand the question that I'm
15 asking, I would ask that you tell me so.  Okay?
16   A  Sure.
17   Q  Okay.  If you don't say anything, I'll assume
18 you understood the question.
19   A  Okay.
20   Q  Okay?  And of course, for the court reporter,
21 you have to answer orally.  Okay?  Not with a nod of
22 the head.
23   A  Okay.
24   Q  Okay?  Very good.  I want to talk a little
25 bit about your background.  You're here today because

**6**

1  you owned the McDonald's restaurant where the incident
2  allegedly took place?
3    A  Yes.
4    Q  Okay.  And this is the incident -- the
5  incident, I'll refer to it as the incident a number of
6  times today.  But this is an incident that occurred on
7  September 15, 2004 at approximately 9:30 p.m.
8  involving the Parkers and supposedly an employee of
9  McDonald's, Mr. Holland.  Okay?
10   A  Okay.
11   Q  So that's the incident we'll be talking about
12 today.  And the McDonald's we're talking about today
13 was the McDonald's on New York Ave.?
14   A  Yes.
15   Q  Is that the one near the intersection of?
16   A  Bladensburg Road and New York.
17   Q  Bladensburg?
18   A  2228 New York Avenue.
19   Q  Is that right near the Peoples building?
20   MS. JOHNSON:  No.
21   MR. BUTLER:  No, not that one?
22   MS. JOHNSON:  No.
23 BY MR. BUTLER:
24   Q  When did you become the owner of that
25 McDonald's?

**7**

1    A  December of 1998.
2    Q  And I was reading through the answers, it
3  indicated that at some point you sold that ownership
4  interest?
5    A  That's correct.
6    Q  When was that?
7    A  December 1, 2004.
8    Q  Okay.  And when you owned it in 1998, what
9  was the official name?
10   MS. JOHNSON:  Of what?
11   A  Of what?
12   Q  Of your holding.
13   A  Rardin Enterprises.
14   Q  So Rardin Enterprises?
15   A  Doing business as McDonald's.
16   Q  Is that a situation where you bought into the
17 franchise?
18   A  I beg your pardon?
19   Q  Did you have to buy a franchise?  Why don't
20 you explain the situation to me, how you came to
21 acquire that particular McDonald's at that time.
22   A  I was an approved franchisee with McDonald's
23 Corporation and I was given the opportunity to
24 purchase that store, which I did, as a franchisee.
25   Q  Okay.  In December 1998?

**8**

1    A  We're also referred to as owner/operators.
2    Q  And that was through Rardin Enterprises?
3    A  Correct.
4    Q  Do you own Rardin Enterprises?
5    A  Correct.
6    Q  Are you the sole owner of Rardin
7  Enterprises?
8    A  Yes.
9    Q  Is that the only McDonald's that you owned at
10 that time?
11   A  No.
12   Q  How many other McDonald's did you own at that
13 time?
14   MS. JOHNSON:  Objection.
15   THE WITNESS:  Beg your pardon?
16   MS. JOHNSON:  Objection.  Relevance.  Go
17 ahead and answer.
18   THE WITNESS:  Go ahead and answer?
19   MS. JOHNSON:  Yes, you can.
20   THE WITNESS:  I'm trying to remember it
21 exactly.  It was more than 10.
22 BY MR. BUTLER:
23   Q  More than 10 and less than?
24   A  Zero.
25   Q  No.  You said it's definitely more than 10 at

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

7 (Pages 25 to 28)

---

**25**

1  paper, all that stuff that you would need to operate
2  your business.
3      A  Okay. Yes.
4      Q  Okay. Was Mr. George Holland employed as of
5  September 15, 2004 at the New York Ave. store?
6          MS. JOHNSON: At the time of the occurrence.
7      A  Yes.
8      Q  Do you know if he was actually on shift that
9  night or working that night, the occurrence?
10     A  And we have the time of the occurrence --
11         MS. JOHNSON: I think we've conceded that he
12  was actually working that night. We're not taking the
13  position that he was not an employee --
14         MR. BUTLER: Okay.
15         MS. JOHNSON: -- of Rardin at the time of the
16  occurrence.
17  BY MR. BUTLER:
18     Q  So on September 15, 2004, do you know when
19  his shift started?
20     A  No.
21     Q  Okay. September 15, 2004, do you know when
22  his shift would have ended?
23     A  No.
24     Q  As of September 15, 2004, do you know what
25  his job title was?

---

**26**

1      A  Crew person.
2      Q  And what does a crew person do?
3      A  A crew person can be trained in a variety of
4  functions. Front counter, cashier, drive-through,
5  order taker, drive-through cashier, maintenance
6  person, lobby person and many positions in the grill
7  section.
8      Q  Now, if you have a position in the grill
9  section, could you also be called a cook?
10     A  We do not call them cooks. We call them
11  grill people. Grill, members of the grill team.
12     Q  Okay. And as of September, that night,
13  September 15, 2004, do you know which one of these
14  jobs Mr. Holland had?
15         MS. JOHNSON: Objection to form of the
16  question. I thought he said he was a crew person.
17  You mean which specific job he was doing that, at
18  night?
19     Q  I think he went on to explain that as a crew
20  person, he could have a variety of jobs. So my
21  follow-up question to that would be Mr. Holland, on
22  September 15, 2004, do you know which of these Variety
23  of jobs he was performing that night?
24     A  Can I answer what I have, what I believe to
25  be true?

---

**27**

1          MS. JOHNSON: Yeah.
2      Q  That's fine with me.
3      A  My understanding is that he was performing
4  tasks in the grill section.
5      Q  And how did you come by that understanding?
6      A  I was informed of that by Julia.
7          MS. JOHNSON: Carter.
8      A  Carter.
9      Q  And when you say tasks in the grill section,
10  what does that include?
11     A  The preparation of any of our products that
12  are made in the grill section.
13     Q  And what products are made in the grill
14  section?
15     A  Hamburgers, chicken sandwiches, nuggets,
16  chicken selects, fish sandwiches.
17     Q  And for Mr. Holland on that night to work in
18  the grill section, what tools would he need to do his
19  job?
20     A  Gloves for the appropriate, excuse me.
21  Gloves for the safe handling of food required by the
22  health department, spatula to remove meat products,
23  patties from the grill, tongs to remove chicken
24  products, nuggets, et cetera, et cetera from universal
25  holding cabinet. I can't think of any others.

---

**28**

1      Q  Is that all you can think of at this time?
2  You said gloves, spatula and thongs?
3          MS. JOHNSON: Tongs.
4          MR. BUTLER: Strike that.
5      A  Tongs which they pick up the filet-o-fish, et
6  cetera.
7      Q  Sure.
8      A  From the universal holding cabinet tray.
9      Q  So the gloves, the spatula and the tongs?
10     A  Yes.
11     Q  Is that all a grill section employee would
12  need to do their job?
13     A  A grill scraper. A grill scraper which
14  cleans the grill after a run of meat.
15     Q  Okay. So gloves, spatula, tongs and a
16  scraper?
17     A  Correct.
18     Q  That's all a grill section employee would
19  need to do their job?
20     A  Yes.
21     Q  Are there any knives in the store?
22     A  No.
23     Q  Is there any cutting necessary?
24     A  No.
25     Q  In the grill section?

---

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

8 (Pages 29 to 32)

29

**Everything comes precut.**
< Even the lettuce?
A  Yes.
Q  So it would be your testimony when you are
running a McDonald's kitchen or at least the one you
were running or your company was running in September
15, 2004, that to run that grill section and the
entire store, there would be zero need for knives?
A  **Absolutely.**
MS. JOHNSON: I think his testimony is a
little broader than that. There are no knives. I
mean, you said no need for them so I'm just trying to
--
A  **There are no knives in the store.**
Q  And there's never a need for a knife in the
store?
A  **That's correct.**
Q  Okay. There's never a time you go, you think
to yourself oh, boy, I wish we had a knife here?
MS. JOHNSON: Well, they might think about it
while there.
A  **I can never really think of a time when we
ever need it. We do not allow them in the store. We
don't need them in the store.**
Q  Do you know who else was working that night,

30

September 15, 2004 --
A  No.
Q  -- when the incident happened? Okay. Is it
something Mr. Reese would know?
A  Possibly.
MS. JOHNSON: And let me say this off record.
(Discussion off the record.)
BY MR. BUTLER:
Q  As of September 15, 2004, what, you're aware
of the allegations about what happened that night?
A  **Could you repeat that, please?**
Q  September 15, 2004, you're aware of what's
being alleged happened that night by the Parkers?
A  **No.**
Q  Are you aware that the Parkers are alleging
that one of the McDonald's employees assaulted them?
A  **No.**
Q  Are you aware that there's a lawsuit against
McDonald's and Rardin Enterprises?
A  **No.**
Q  Okay.
MS. JOHNSON: He's talking about this
lawsuit.
THE WITNESS: I did not know that on 9/15.
MS. JOHNSON: Oh.

31

THE WITNESS: He's asking did I know about
it, I think he's asking --
MS. JOHNSON: No. I think you took the
question too literally or else --
MR. BUTLER: Yes. I'm just saying --
MS. JOHNSON: Generally.
BY MR. BUTLER:
Q  Generally, are you aware that the Parkers are
alleging that Mr. Holland assaulted them?
A  **With no -- you aren't speaking as of a
specific time?**
Q  Right, as of a specific time?
MS. JOHNSON: As you sit in the chair
today.
A  **As I sit in this chair today?**
Q  Yes.
A  Yes.
Q  And you are aware of some of the specific --
A  Yes.
Q  -- allegations they're making?
A  Yes.
Q  Okay. It's only getting to my question which
is as of September 15, 2004, what would have been the
standard operating procedure for dealing with an
incident like that?

32

MS. JOHNSON: Objection to the form.
Q  By the store manager?
MS. JOHNSON: Objection to the form of the
question. Go ahead and answer if you can.
A  **Well, the store manager was not there that
night.**
Q  That was Mr.?
A  **Julia Carter.**
MS. JOHNSON: No, store manager.
A  David Claybrooks.
Q  So David Claybrooks was not there that night?
A  **He was off that night.**
Q  So who was acting manager?
A  **Julia Carter.**
Q  Is that also called assistant manager?
A  **She would be considered an hourly paid swing
manager. There are many levels of management that we
go through. Crew and so forth, all in there.**
Q  And based on all the classes that you had
taken up to September 15, 2004, you yourself --
A  **Me?**
Q  That's correct. As the owner of Rardin
Enterprises, how would you expect the acting manager
to handle an incident such as September 15, 2004?
MS. JOHNSON: Object to the form. Go ahead

Case 1:05-cv-01782-DAR    Document 29-2    Filed 08/29/2007    Page 12 of 25
DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

13 (Pages 49 to 52)

49

1  Q  We can maybe look at that at some point.
2  Other than that, would there be any questions on the
3  application with regard to their, as to whether or not
4  --
5  A  Experience.
6  Q  Okay. Experience. Would there be any
7  questions as to whether or not they had any criminal
8  convictions or a record?
9  A  Yes. There's a question on there that says
10 during the past seven years, have you been convicted
11 or charged with any crime other than misdemeanors or
12 minor traffic violations? It also states on the
13 application, by answering yes, it does not necessarily
14 bar you from employment.
15 Q  Okay. Why seven years? Do you know?
16 A  I don't know. It's seven years on the
17 permanent record folder. I believe the current
18 application is five, five years.
19 Q  But as of August 2002, it was seven?
20 A  It was seven and there's also a question
21 there, do you have any kind of disease that would
22 prevent you from handling food or working in a food
23 service establishment?
24 Q  Okay. Now, do you -- we're talking about Mr.
25 George Holland, who was hired August 2002. Do you

50

1  know who hired Mr. Holland?
2  A  No.
3  Q  It would have, I guess, been the store
4  manager at that time?
5  A  It should be -- it would have to be Sulema or
6  someone, her supervisor, or --
7  Q  Right. We did talk about this.
8  A  -- the store manager, a supervisor or the
9  director of operations.
10 Q  Did you have a copy of Mr. Holland's
11 application?
12     MS. JOHNSON: You don't have that in
13 discovery? Or you just may not have it with you? We
14 can go off the record here.
15     (Discussion off the record.)
16     (Break taken from 11:47 to 11:49 a.m.)
17     (Rardin Deposition Exhibit No. 2 was marked
18 for identification and retained by Ms. Johnson.)
19 BY MR. BUTLER:
20 Q  Mr. Rardin, I'm looking at what's been marked
21 as Exhibit No. 2 which I had asked for. It's Mr.
22 Holland's employment application and he, this was
23 August 9, '02. And the seven-year question is on
24 there. During the seven years, whether he's ever been
25 convicted of or pled guilty to or pled no contest to a

51

1  crime excluding misdemeanors and traffic violations
2  and he put no. We're in agreement on that?
3  A  Yes.
4  Q  I'm handing you Exhibit No. 2, ask you to
5  take a quick look at it and just confirm that is the
6  application of Mr. Holland.
7  A  Yes.
8  Q  Thanks. And I'll refer to it as a personnel
9  file. But does a personnel file for Mr. Holland exist
10 separate and apart from that?
11 A  No.
12 Q  Okay. Does McDonald's keep personnel files
13 on its employees to put things like warnings in or
14 certificates of good, you know, of good conduct or
15 anything like that?
16     MS. JOHNSON: Objection to the form of the
17 question. Rardin Enterprises.
18     MR. BUTLER: Rardin Enterprises. Sure. I
19 meant to say Rardin Enterprises.
20     THE WITNESS: Should I go into the fact that
21 this is a folder?
22     MS. JOHNSON: Yes.
23 A  What we have made is a copy of the front and
24 the back of a folder that is joined all the way around
25 except at the top and all of these things would be

52

1  placed in here.
2  Q  Okay.
3  A  And then in some cases, which looks -- this
4  is it. This is the way it looks.
5  Q  Okay.
6     MS. JOHNSON: This is it.
7  A  This is a folder and all of those things that
8  go in there. A lot of times they're reviewed --
9  Q  Mr. Holland?
10     MS. JOHNSON: Uh-huh. I don't want to mark
11 that one because of the issues we have talked about.
12 Q  Okay. I'm looking at what's been given to me
13 as a licensee crew member records folder for Mr.
14 Holland.
15 A  Correct.
16 Q  And it has, on the front part of the folder
17 is the application and then are these the same
18 documents that you have in your hand --
19 A  Yes.
20 Q  -- that I'm holding that I just pulled out of
21 the folder?
22 A  Yes.
23 Q  Okay. And what types of things go into the
24 crew member records folder?
25 A  Well, the McDonald's general rules and

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

15 (Pages 57 to 60)

57

1  to, if someone does something incorrect, you deal with
2  it one-on-one.  If they do something nice, you say it
3  in front of everybody.
4      Q  Okay.  Other than this question on the
5  application regarding the past seven years before, you
6  know, as they're applying, is there anything else
7  Rardin Enterprises did in August of 2002 to check into
8  a person's background?
9      A  No.
10      Q  During the interview process, does the store
11  manager inquire into a person's criminal background?
12      A  If you notice on the application, that
13  question is asked by the store manager.
14      Q  As they sit there, they just read through the
15  application?
16      A  This section to be filled out by manager
17  only.
18      Q  Okay.
19      A  This sentence.  So we just don't rely on
20  them.  You see the little dark section there?  Let me
21  show you.  Right there.
22      Q  So you ask them that question, the seven-year
23  question?
24      A  Yes, yes.
25      Q  Okay.

58

1      A  But the store manager that is doing the
2  hiring asks that question.
3      Q  But there's no other, independent of that,
4  there's no other check that goes on for each employee
5  into their background?
6      A  Correct.
7      Q  How many employees on average, if you can
8  give me an estimate, would a single store like New
9  York Ave. hire in a given year?
10      MS. JOHNSON: Objection to form.  Go ahead.
11      A  The crew size, crew management team there
12  would be probably be about 35 to 40 and if the
13  turnover is 200 percent, it would be 70, 75, 80 people
14  per year.
15      Q  When did you first learn of the incident in
16  question on September 15, 2004?
17      A  It was months after that occurred.  I don't
18  have the exact.
19      Q  And how did you hear about it?
20      A  I received a letter from plaintiffs'
21  attorney.
22      Q  What steps did you take after receiving the
23  letter from plaintiffs' attorney?
24      MS. JOHNSON: Objection.  This is privileged
25  information.  Do not discuss anything that you

59

1  discussed with any attorney.
2      Q  Right, other than what you discussed or did
3  with your attorney or any attorneys.
4      A  Wait a minute.
5      MS. JOHNSON: Can we step out?  I don't know
6  exactly what the answer is to this.
7      A  No.  I mean, what is the question?
8      Q  What actions did you take when you got the
9  letter from the plaintiffs' attorney other than any
10  correspondence or communication you had with your
11  attorney?  I need to know.
12      A  When I received the letter, I immediately
13  called my insurance carrier and reported the incident
14  to them and forwarded a copy of the letter from
15  plaintiffs' attorney to them.
16      Q  What else?
17      A  I called the store.  At this time, I did not
18  own the store.  I had sold the store.  I called the
19  store to see if I could determine if anyone knew where
20  Julia Carter might be working and she was still
21  working at the store for the new owner.
22      Q  Okay.  So you talked to Ms. Carter?
23      A  Yes, briefly.
24      Q  What did Ms. Carter say?
25      A  I asked her about the incident and she said

60

1  that she remembered it and that was essentially it.  I
2  didn't go into anything else with her.
3      Q  You didn't ask her what she saw?
4      A  I asked her if -- I can't.  I just don't
5  remember what I asked her.  She may remember but I
6  can't remember what I asked.  It was a very brief
7  conversation.
8      Q  Did you ask her if she had brought the
9  incident to the attention of her supervisors?
10      A  No.
11      Q  Do you know if Ms. Carter ever reported the
12  incident to her supervisors?
13      A  I have since heard from her that as soon as
14  the incident happened, she called her store manager,
15  which is proper procedure, and the employee's wife.
16      Q  So it's Mr. Claybrooks?  No.
17      A  She called Mr. Claybrooks --
18      Q  Claybrooks, right.
19      A  -- and reported it to him and he said what
20  happened?  And she -- but the store was closed then.
21  The store was closed.  And then she called Mr.
22  Holland's spouse.
23      Q  Do you know George Holland's spouse's name?
24      A  No, I do not.
25      Q  Do you know what action Mr. Claybrooks took

DEPOSITION OF DAVID RARDIN
CONDUCTED ON MONDAY, MARCH 12, 2007

17 (Pages 65 to 68)

**65**

1  A  Do you want me to provide that?
2  MS. JOHNSON: Just recently.
3  A  From April '05 through January 6, '06.
4  Q  He was working where?
5  A  At a McDonald's in D.C.
6  Q  Okay. And I understand at some point, he
7  also returned to the New York Avenue store after the
8  sincident?
9  A  Yes, I believe he returned after my
10  son-in-law had purchased the store.
11  Q  What's your son-in-law's name?
12  A  Mark Furr.
13  Q  You how do you spell Furr?
14  A  F-U-R-R.
15  Q  Is he still your son-in-law?
16  A  Yes.
17  Q  Okay. He's the one that bought the store
18  from you in?
19  A  12/1.
20  Q  December '04?
21  A  Right.
22  Q  And he still owns it?
23  A  Yes.
24  Q  So at some point they hired Mr. Holland back?
25  A  That's my understanding. Yes.

**66**

1  Q  When you sold the store in December '04, was
2  Mr. Holland still working?
3  A  No.
4  Q  For New York Ave.?
5  A  No.
6  Q  Do you know how his employment came to an
7  end?
8  A  It was my understanding that after the, after
9  that evening, he never returned to the store.
10  Q  Okay.
11  A  So he abandoned his job.
12  Q  So in technical terms, in employment jargon,
13  you would have considered, after the September 15,
14  2004 incident, you would have considered his
15  employment status to be one of an employee who has
16  abandoned his position?
17  A  Yes.
18  Q  And that's as opposed to a termination or
19  absent without leave or trying to think of all the
20  other --
21  A  Well, it would be absent without leave.
22  Q  I guess he would be considered absent without
23  leave also. But not on workers' comp.?
24  A  Correct.
25  Q  Not vacationing?

**67**

1  A  And this is not uncommon for employees to not
2  show up the next day and not let us know they have
3  family emergencies, et cetera that we don't know
4  about.
5  Q  So after September 15, 2004 and between
6  September 15, 2004 and December 1, 2004, Rardin
7  Enterprises did not have to take any employment action
8  against Mr. Holland?
9  A  That's correct.
10  Q  But at some point after December 1, 2004,
11  your son-in-law, Mark Furr, hired Mr. Holland to work
12  for him or allowed him to come back?
13  A  Well, Mark probably did not even know he had
14  been hired because, again, his store manager would
15  have hired him back.
16  Q  Okay.
17  A  So it's possible for the store manager, they
18  have the authority, after the appropriate training, to
19  hire employees without the knowledge of the
20  owner/operator.
21  Q  Do you know if Mr. Holland would have to file
22  a new employment application?
23  A  Yes, he would have.
24  MR. BUTLER: Okay. Do you have a copy of
25  that?

**68**

1  MS. JOHNSON: No.
2  MR. BUTLER: No?
3  MS. JOHNSON: Separate business.
4  A  It's a separate business. But no.
5  Q  Up to this point, you've identified the crew
6  packet with Mr. Holland's application, the possibility
7  that there's an electronic file on him with the store.
8  You've got the rules and policies here, the licensee
9  crew member record folder which I think I just called
10  the crew packet. Do you possess any other documents
11  regarding Mr. Holland?
12  A  None.
13  Q  Other than those? Okay. Then I will just
14  take a moment.
15  MS. JOHNSON: Okay.
16  MR. BUTLER: As I say -- we can go off the
17  record.
18  (Break taken from 12:20 to 12:25 p.m.)
19  MR. BUTLER: I have no more questions of you.
20  Thank you, Mr. Rardin. Thank you very much.
21  THE WITNESS: You're welcome.
22  (Signature having been not been waived, the
23  deposition of DAVID RARDIN concluded at 12:25 p.m.)
24
25

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

1 (Pages 1 to 4)

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF COLUMBIA
3    ------------------------------x
4    ANTOINETTE M. PARKER, et al.:
5        Plaintiffs      :
6    v.            :  1:05-cv-01782
7    GEORGE E. HOLLAND, et al.  :
8        Defendants      :
9    ------------------------------x
10        Deposition of GEORGE HOLLAND
11            Washington, D.C.
12          Monday, March 12, 2007
13              3:49 p.m.
14
15
16
17
18
19
20
21
22
23    Job No.: 1-99104
24    Pages: 1 - 104
25    Reported by: Linda Bahur, RPR

**Page 2**

1        Deposition of GEORGE HOLLAND, held at:
2    Bonner Kiernan Trebach & Crociata, LLP
3            1233 20th Street
4              Suite 800
5          Washington, D.C. 20036
6
7
8
9        Pursuant to agreement, before Linda M.
10   Bahur, Registered Professional Reporter and Notary
11   Public of the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1        A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3        WILLIAM BUTLER, ESQUIRE
4        THOMAS V. MILLER, JR., P.A.
5        8808 Old Branch Avenue
6        P.O. Box 219
7        Clinton, Maryland 20735
8        (301) 856-3030
9
10   ON BEHALF OF DEFENDANT RARDIN ENTERPRISES:
11       D'ANA JOHNSON, ESQUIRE
12       BONNER KIERNAN TREBACH & CROCIATA, LLP
13       1233 20th Street, N.W.
14       Suite 800
15       Washington, D.C. 20036
16       (202) 712-7000
17
18
19   Also present:  David Rardin
20
21
22
23
24
25

**Page 4**

1        C O N T E N T S
2    EXAMINATION OF GEORGE HOLLAND      PAGE
3    by Ms. Johnson              5
4    by Mr. Butler              41
5
6
7
8
9        E X H I B I T S
10      (No exhibits marked)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT

tabbies® D _____

Case 1:05-cv-01782-DAR    Document 29-2    Filed 08/29/2007    Page 16 of 25
DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

4 (Pages 13 to 16)

**13**

1  Q  Okay.
2  A  And the second one was either 2000 or, 2001
3  or 2000.
4  Q  What was that for?
5  A  Same thing.
6  Q  So you have a drug problem?
7  A  Yes.
8  Q  Does that interfere with your ability to
9  work?
10  A  Yes.
11  Q  Okay.  You ever been treated for alcohol
12  abuse?
13  A  No.
14  MS. JOHNSON:  We're going to take a break
15  now.
16  (Break taken from 3:59 to 4:20 p.m.)
17  BY MS. JOHNSON:
18  Q  When you first worked at McDonald's in 1982,
19  were you given an orientation?
20  A  Yes.
21  Q  Okay.  And in that orientation, were you told
22  that having a weapon on the premises was a basis for
23  termination?
24  A  Yes.
25  Q  And did you ever have a weapon on the

**14**

1  premises of McDonald's?
2  A  No.
3  Q  Okay.  Were you told that involvement with
4  the abuse or threatening behavior toward any customer
5  is prohibited?
6  A  Yes.
7  Q  In fact, were you given a copy of what we
8  have here as Exhibit Number 1?
9  A  It wasn't a sheet.  It was, like, a book.
10  Q  A book?  Okay.
11  A  Yes.
12  Q  And that's what you got in 1982?
13  A  Yes.
14  Q  And that has always remained the policy of
15  McDonald's, hasn't it?
16  A  Yes.
17  Q  And you know that if you had a weapon on the
18  premises of a McDonald's, you would be terminated on
19  the spot?
20  A  Yes.
21  Q  And you know also that if you pushed or
22  punched a customer, that was a basis for termination
23  on the spot?
24  A  Yes.
25  Q  Okay.  Would you take a look at what's been

**15**

1  marked as Exhibit Number 1.  And whether it was in
2  this format or not, are those the rules that you were
3  aware of as an employee of McDonald's?
4  A  Yes.
5  Q  That's Exhibit Number 1 in Rardin's
6  deposition.  I'm going to show you just briefly the
7  outside of this packet.  Did you ever receive a packet
8  like this?
9  A  Yes.
10  Q  Okay.  And do you remember when it was that
11  you first received that packet that said Welcome to
12  McDonald's?
13  A  When I first started working for McDonald's.
14  Q  In 1982, you received such a packet?
15  A  Yes.
16  Q  And that document or those rules and
17  regulations that are set forth in that Exhibit Number
18  1 was among the things that you were told?
19  A  Yes.
20  Q  Now, every time that you left a McDonald's
21  and came back to McDonald's for employment,
22  reemployment, did you go through the same orientation
23  process?
24  A  Yes.
25  Q  Okay.  And every time you did that, then you

**16**

1  were told you can't have a weapon on the premises;
2  that's grounds for termination?
3  A  Yes.
4  Q  There's no question in your mind that was a
5  prohibited conduct at McDonald's?
6  A  Yes.
7  Q  How about alcohol?
8  A  No alcohol or drugs.
9  Q  And if you had alcohol or drugs found on your
10  person, that was a --
11  A  Reason for my termination.
12  Q  Do you know who Sulema Atkins was?
13  A  Yes.  She was store manager for McDonald's.
14  Q  Okay.  Was she the person that you met with
15  and hired you in 1982?
16  A  No, that's not.  She wasn't.  I met her, I
17  didn't meet her until, I was working for her in the
18  nineties.
19  Q  Did she hire you at one point in time?
20  A  Yes.
21  Q  Do you remember when that was that she hired
22  you?
23  A  The McDonald's I was working in in
24  Bladensburg, that was in '01 or '02.
25  Q  Okay.  2001 or 2002?

Case 1:05-cv-01782-DAR    Document 29-2    Filed 08/29/2007    Page 17 of 25
DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

5 (Pages 17 to 20)

**17**

1    A   Yes.
2    Q   Would you take a moment and just tell us all
3 the McDonald's that you have worked for, worked at.
4 Worked at.
5    A   Well, my first one was the one on New York
6 Avenue.
7    Q   Keep your voice up now.
8    A   New York Avenue and Bladensburg Road.  I
9 worked at Barney's Circle in southeast and Bladensburg
10 Road.  Actually, it was only two.
11    Q   What I want you to do is not think out loud.
12 Think to yourself and then just tell me.  Okay.  So we
13 have the first one.  Not necessarily in order, but
14 just tell me.  It was New York Avenue, Bladensburg,
15 then Barney's Circle?
16    A   Yes.
17    Q   What's another one?  We'll come back and get
18 the dates.  What's another one?  Bladensburg Road?
19    A   I worked Bladensburg Road.
20    Q   Is that different than the one we're talking
21 about?
22    A   Well, no.  Bladensburg Road and New York
23 Avenue, that's the same.
24    Q   Okay.
25    A   Same one.  Bladensburg Road and New York

**18**

1 Avenue.
2    Q   So when you say Bladensburg Road, you mean
3 also the New York Avenue?
4    A   Yes.
5    Q   The same one that's involved with this
6 incident?
7    A   Yes.
8    Q   So we've got two, New York Avenue and
9 Bladensburg Road and Barney's Circle.  Any others?
10    A   The one in Bladensburg, Maryland.
11    Q   Okay.  Any others?
12    A   No.  Those are the only three McDonald's I
13 ever worked at on and off.
14    Q   Now, you told me you worked at the New York,
15 Bladensburg and New York in 1982?
16    A   Yes.
17    Q   Okay.  And how long did you stay that time?
18    A   I think I stayed with them for about a year,
19 year-and-a-half.
20    Q   That would take us to 1983?
21    A   Yes.
22    Q   Then what did you do?
23    A   After that, I worked for a cleaning company.
24 I think it was either the first cleaning company.  It
25 was National Cleaning Company.

**19**

1    Q   When did you come back to work at any
2 McDonald's after 1983?
3    A   I think I started back at McDonald's again in
4 '85 or '86.
5    Q   Okay.  And how long did you work that time?
6    A   I'm going to say about six months.
7    Q   Six months?
8    A   Yes.
9    Q   Okay.  Was that the New York Avenue and
10 Bladensburg Road then?
11    A   Yes.
12    Q   So let's say that takes you to '86.  Then
13 when did you come back and work again?
14    A   About '87.
15    Q   All right.  And how long did you work then?
16    A   For about a year-and-a-half.
17    Q   So that would take you to the middle of, that
18 would take you to '89?
19    A   Yes.
20    Q   All right.  Then when is the next time you
21 came back?
22    A   I'm not quite sure.  I know it was like '90,
23 I think it was like '91.  About '91 because that's
24 when my first daughter was born.
25    Q   Okay.  And how long did you work that time?

**20**

1    A   I think I stayed there for about a year to
2 two years.
3    Q   Okay.  Let's make that '93.  And then when
4 was the next time you came back?
5    A   About '94.
6    Q   '94?
7    A   Yes.
8    Q   All right.  And how long did you stay that
9 time?
10    A   About a year.
11    Q   And was that also at New York Avenue?
12    A   No.  That's one, I think this one I was at
13 Barney's Circle.
14    Q   That was in '95?
15    A   Yes.
16    Q   How long were you at Barney's Circle?
17    A   For about a year.
18    Q   '96.  So, then, when would you come back
19 next?
20    A   Next time I came back for McDonald's was
21 about '99.
22    Q   All right.  You stayed there what?
23    A   '99, it was about a year.  About a year.
24    Q   Would I be right to say that you'd come
25 there, come to a McDonald's, worked for about a year

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

6 (Pages 21 to 24)

---

**21**

1  maximum, sometimes a year-and-a-half, and then you'd
2  leave and go do something else?
3     A  Yes.
4     Q  And then come back to McDonald's?
5     A  Yes.
6     Q  And when you left to do something else, what
7  did you normally go do?
8     A  Cleaning company.
9     Q  Okay.  So you were either working at the
10  McDonald's or going, working at the cleaning company?
11     A  Yes.
12     Q  All right.  In connection with this incident,
13  when was it that you came to McDonald's before the
14  2004 incident?  How long had you been working there?
15     A  Before the incident?
16     Q  Yes.
17     A  I was, I think I started back in 2003.
18     Q  Well, we've got an application that says you
19  started in August of 2002.  Would that be right?
20     A  Probably right.  2002.
21     Q  Take a look at those documents that are
22  marked there.
23     A  Yes, that's right.  I was living on Anacostia
24  Road.  Me and my wife was living on Anacostia Road.
25     Q  Let me show you this and ask you, take a look

---

**22**

1  through here and see, it says August 9th of 2002.  I'm
2  going to show you this page.  It talks about you
3  certified that's your signature below, indicating that
4  you read all of that.  Does that refresh you when you
5  came back to work at the McDonald's on --
6     A  Yes, yes.  That's about right.
7     Q  2002, August 9, 2002?
8     A  Yes.
9     Q  On August 9, 2002, when you came back to work
10  at the McDonald's, you knew all about all the
11  policies, no weapons, get terminated?
12     A  Yes.
13     Q  No drugs, get terminated?
14     A  Yes.
15     Q  No abusing, no punching the customers, get
16  terminated?
17     A  Yes.
18     Q  You knew all that, right?
19     A  Yes.
20     Q  You were well aware of those things, right?
21     A  Yes.
22     Q  All right.  Tell me what happened on
23  September 14, 2004 as you remember it.
24     A  Okay.
25     Q  I'm sorry, September --

---

**23**

1     MR. BUTLER:  15th, yeah.
2     Q  -- 15, 2004.  You know what we're talking
3  about, right?
4     A  Yes, the incident that happened between me
5  and the defendant, the plaintiff.
6     Q  Yes.
7     A  Okay.  That night, I was in the grill section
8  with another crew person.  My manager, Julia, she was
9  on the front line because she was the cashier.  We had
10  no cashier that night and the other manager, Curtis,
11  was in the office and the plaintiff and his wife
12  walked in to order their food.
13     Me and the crew person that was in the grill
14  section with me, we was, we noticed the plaintiff's
15  wife and we was looking at her and I guess she noticed
16  we was looking at her back.  And to me, it seems like
17  she noticed that we was, well, we say checking her
18  out.  And she dropped something on the floor about
19  once or twice and kept looking back at us like she
20  know that we was looking at her.  And then she went to
21  sit down and her husband was still in line ordering
22  the food and after he ordered, he went to sit down
23  with her and put his arm around her like to let us
24  know that he was with her.
25     So Julia asked me could we close the inside

---

**24**

1  at 10, and the drive-through stay open until 11.  She
2  asked me to go lock the doors.  Another customer in
3  line.  I'm not sure if it was a bus driver or a DPW
4  driver.  And I'm standing there and I had the locked,
5  waiting for them to leave.  So when the other
6  customer, on his way out, he tapped me on the arm and
7  point at the plaintiff's wife and say she got a fat
8  behind, and I said yes.
9     So the plaintiff turned around and said man,
10  that's disrespectful.  So the other customer that was
11  on his way out said, who are you talking to?  He said,
12  I'm not talking to you, I'm talking to him.  So he
13  said when you and the main man was back in the grill
14  section, I didn't say nothing when y'all was checking
15  my wife out, but man, that is real disrespectful.  I
16  said, man, I'm not trying to hear that.  My manager
17  asked me to lock the door and that's what I'm doing,
18  so.
19     The other customer left and I think they was
20  waiting on fries, so they was still in line.  Their
21  fries came out about five minutes later after that
22  and on the way out, as they was leaving, I had the
23  door open for them to walk out and he walks up to me
24  like this.
25     Q  What's "like this" mean?

---

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

9 (Pages 33 to 36)

---

33

1    A   No.  First time I ever seen him.
2    Q   Well, how did he know to tap you on the arm?
3    A   I don't know.  I mean, he was checking her
4 out, too.
5    Q   And you said -- did you have any idea where
6 he was from?
7    A   Who, the customer?
8    Q   Uh-huh.  Did he have on any shirt or any
9 clothes --
10    A   His clothes, he had on blue, all blue.
11    Q   Did his clothes identify where he worked?
12    A   It was either DPW because I think have a lot,
13 we have a lot of DPW and metro workers come through
14 there.
15    Q   Okay.  But you don't remember seeing -- it
16 was your first time seeing him I think you said?
17    A   Yes.
18    Q   Now, when Mr. Parker said you were being
19 disrespectful to his wife, did you agree with that?
20    A   Well, yeah.  I mean, it was kind of
21 disrespectful, yes.
22    Q   Why?
23    A   Because, I mean, eventually I figured it out,
24 that she was with him, and if it was me, I wouldn't
25 want nobody else looking at my wife like that either.

---

34

1    Q   Okay.  Did you see them come in together?
2    A   Yes.
3    Q   Okay.  So you knew they were together, right?
4    A   Well, I knew they came in.  I mean, when I
5 seen them when they came in together, but I can't say
6 around that time that I didn't know that they were
7 actually together like husband and wife.  I didn't
8 know.
9    Q   Okay.  And did you say anything while they
10 were sitting down eating their dinner?
11    A   No, I didn't say anything.  I just kept -- me
12 and the other crew person, we kept gazing over the bin
13 watching.
14    Q   You kept looking at her, didn't you?
15    A   Yes.
16    Q   And you looked at her a lot, didn't you?
17    MR. BUTLER:  Objection.
18    A   Yes.
19    Q   But you didn't say anything to her then, did
20 you?
21    MR. BUTLER:  Objection, leading.
22    A   No.
23    Q   And then did Mr. Parker approach you first?
24    A   Yes.  He approached me as he was walking out
25 the door.

---

35

1    Q   And you were doing the job keeping the door
2 locked?  Getting ready to lock the door?
3    A   Lock them, yes.
4    Q   And when you were doing that, what was it
5 that Mr. Parker said to you?
6    A   Well, when they were on their way out of the
7 door, he got up in my face and, like, what now?
8 That's when I shoved him back and he came up once
9 again and I took the palm of my hand and shoved him in
10 his face and get ready to come back and well,
11 when I threw my hands up, because it was like my third
12 time when he came back, if he was going to hit me, I
13 was going to hit him.
14    Q   Let me ask you.  Did he actually say the
15 words what's up now or what's now?
16    A   Yes.  When he got up, when he got ready to
17 leave, yes.
18    Q   When he got up to leave or when he was at the
19 door?
20    A   When he was leaving the door, leaving out the
21 door.
22    Q   When he said what's up now or what's up, say
23 exactly what he said.  What's up now?
24    A   What's up now?
25    Q   What did you understand him to be meaning by

---

36

1 that?
2    A   I don't know.  Like what's up?  What you want
3 to do?
4    Q   Meaning?
5    A   Meaning that he wanted to fight me because I
6 was looking at his wife.
7    Q   Okay.  And did he have his fist up or did he
8 have any kind of indication that he was going to fight
9 you?
10    A   Well, the indication was when he approached
11 me and got up in my face.
12    Q   Okay.  Now, then you pushed him back.  That's
13 not something McDonald's allows you to do, is it?
14    A   No.
15    Q   And that is grounds for termination, isn't
16 it?
17    A   Yes.
18    Q   All right.  Did you leave the premises?  Did
19 you go out the door into the steps?
20    A   No, I did not.  I never left the premises
21 until I got ready to, until we got ready to, well,
22 until I got locked up.
23    Q   Did you have a knife?
24    A   No, I never had no knife.
25    Q   Are there knives at McDonald's?

---

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

10 (Pages 37 to 40)

---

Page 37

1    A  No.
2    Q  Are there any cutting items at McDonald's?
3    A  No.  Only cutting items what I remember is
4  what we have, we used to slice the tomatoes.  Tomato
5  slicer.
6    Q  A tomato slicer?
7    A  Yes.
8    Q  Not a knife, though?
9    A  No.
10    Q  That's like one of those things you put on
11  there and run a tomato across?
12    A  Yes.
13    Q  Are there any knives that have orange handles
14  or long serrated blades that are ever at McDonald's?
15    A  No.
16    Q  Ever at that store?
17    A  No.
18    Q  Do you own such an item?
19    A  No, I don't.
20    Q  Now, Julia and Curtis came around and grabbed
21  you is what you told us?
22    A  Yes.
23    Q  Okay.  Now, where was Curtis during the time
24  that you were in the back near the grill?
25    A  Curtis was in the office counting the

---

Page 38

1  drawers.
2    Q  Okay.  And was Curtis a manager?
3    A  He was a manager in training at the time.
4    Q  In training?  What does that mean?
5    A  He was on his way to become a manager.
6    Q  And Julia was the actual manager?
7    A  Yes.
8    Q  What time was the McDonald's supposed to
9  close?
10    A  We close at 11:00.
11    Q  Is that closing the whole store or closing
12  the drive-through?
13    A  The whole store.
14    Q  Okay.  Was there a time when you closed the
15  interior part?
16    A  Ten o'clock.
17    Q  So you closed the interior part of the
18  restaurant at 10 and the drive-through at 11?
19    A  Yes.
20    Q  And after 11:00, there would be no customer
21  you would serve?
22    A  No.
23    Q  And after 10:00, there would be no customers
24  that you would serve on the --
25    A  On the inside.

---

Page 39

1    Q  On the inside.  Did the officer, detective
2  accuse you of being drunk?
3    A  Well, he found a little bottle of Tanqueray
4  in my pocket but it was never opened and he was, like,
5  this is why the way you acting and I told him I'm not
6  drunk.  I never opened it up.
7    Q  Had you been drinking?
8    A  No.
9    Q  And you know that if you'd been drinking, you
10  also --
11    A  Would have been fired.
12        MS. JOHNSON:  Okay.  Let me just take a
13  moment, please.
14        (Break taken from 4:53 to 4:57 p.m.)
15    Q  I have one more.  Did you ever come back to
16  work at the Bladensburg/New York Avenue store?
17    A  After I got out of jail.
18    Q  And what happened?
19    A  They hired me back and I stayed there for a
20  couple of months.
21    Q  Who hired you back?
22    A  Who was the manager?  It was Tony.
23    Q  Tony who?
24    A  I don't know his last name.
25    Q  And then you left again?

---

Page 40

1    A  Yes.  I left on my own.
2    Q  How long were you in jail?
3    A  Ninety days.
4    Q  What was that for?
5    A  Violation of probation.
6    Q  Okay.
7        MR. RARDIN:  He came back after I had sold
8  the store.
9        MS. JOHNSON:  Okay.
10  BY MS. JOHNSON:
11    Q  You stayed for a couple of what?
12    A  I stayed for, like, a month or two.
13    Q  Okay.  And did you work at any other
14  McDonald's other than the ones that you told me about?
15    A  I worked at L'Enfant Plaza, southwest.
16    Q  And why did you leave there?
17    A  L'Enfant Plaza?
18    Q  Yes.
19    A  When I left there at the time, this time I
20  left there because I had left home.  Me and my wife
21  was going through some problems and I really didn't
22  have a place to stay and, a steady place to stay and
23  it was really kind of hard for me getting back and
24  forth, getting to work.
25    Q  You weren't terminated, were you?

---

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

14 (Pages 53 to 56)

53

1  and object. Based on what he told us, he may have
2  been a juvenile at the time. He was born in '67. In
3  '84, he would have been 17. So I don't know.
4      Q  Were you a juvenile at the time?
5      A  Yes.
6      Q  Of that charge?
7      A  Yeah.
8      MS. JOHNSON: So that's not admissible.
9      Q  But you pled guilty to that?
10     A  Yeah.
11     Q  And they gave you a year's probation?
12     A  Yeah.
13     MS. JOHNSON: Yes?
14     A  Yes.
15     Q  Yes?
16     A  Yes.
17     Q  Now, after 1985, did you have any more
18 arrests for drugs?
19     A  No, no.
20     Q  Are you sure of that?
21     A  Positive.
22     Q  So other than -- what about before 1985?
23     MS. JOHNSON: Objection. That's a juvenile
24 record. It's not admissible.
25     A  That was my first time of being arrested.

54

1      Q  That was your first time, you said, in 1984,
2  1985?
3      A  Yes.
4      Q  Do you remember 1985, or whether it was '84
5  or '85?
6      A  It was '85. I'm not quite sure of what year.
7      Q  Was that in D.C.?
8      A  Yeah, it was in D.C.
9      Q  Do you remember if you went to juvenile court
10 or went to D.C. Superior Court?
11     A  D.C. Superior Court.
12     Q  So other than that first time being arrested
13 for selling cocaine to an undercover police officer
14 and the 1994 or '95 assault charge against the man
15 that was in the apartment building and the domestic
16 violence issues and the incident at McDonald's on
17 September 15, 2004, can you recall any other arrests?
18     A  No.
19     MS. JOHNSON: Objection.
20     A  No.
21     Q  Now, I think you've reviewed this document
22 which is Exhibit Number 2, Rardin, didn't you?
23     A  Yes.
24     Q  And when you applied in August of 2002 to
25 McDonald's, there was a question as to whether or not

55

1  during the past seven years, you'd ever been convicted
2  of or pled guilty to, no contest to a crime excluding
3  misdemeanors and traffic violations?
4      A  I put no.
5      Q  You put no because, in your opinion, between
6  19, I guess it was 1995 and 2002, you had never been
7  convicted of a crime?
8      A  No.
9      Q  Okay. You had given us a fairly long list of
10 stints with McDonald's over the years. I guess
11 starting in 1983, you said that you worked for,
12 between '83 and '85, the New York Ave. branch where
13 the incident took place; is that right?
14     A  Yes.
15     Q  And you left there in 1985 or thereabouts.
16 Do you recall the reason why you left there at that
17 time?
18     A  No. I don't know. I'm not quite sure.
19     Q  Okay. Well, if you started there in '83 and
20 left there '85, that was about the time that you got
21 arrested for the cocaine selling?
22     A  Yes. I was working there and selling drugs
23 at the same time.
24     Q  You were working at McDonald's and selling
25 drugs at the same time?

56

1      A  Yes.
2      Q  And did your manager of McDonald's at that
3  time know about your arrest for the selling of drugs?
4      A  No.
5      MS. JOHNSON: Objection.
6      A  No.
7      Q  Okay.
8      A  Oh, yes, yes, because it was my sister. My
9  sister.
10     Q  Oh, your sister was the manager?
11     A  Yes.
12     Q  And why did your employment come to an end at
13 that time, the first time you left?
14     A  I just left.
15     Q  You just left on your own?
16     A  Yes.
17     Q  But you returned, it says, in 1987?
18     A  Yes.
19     Q  And worked another one-and-a-half years until
20 about 1989?
21     A  Yeah.
22     Q  And do you recall which store that was at?
23     A  It was the same one, New York Avenue.
24     Q  New York Avenue? Was your sister still the
25 manager?

Case 1:05-cv-01782-DAR    Document 29-2    Filed 08/29/2007    Page 22 of 25
DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

23 (Pages 89 to 92)

89

1 in the lobby and he was asking me where was the knife?
2 And I said, I didn't have no knife. And as he was
3 talking to me, at that time, it was two uniformed
4 police. One was standing on each side of me and they
5 taking my stuff out of my pocket.
6    Q  They searched you?
7    A  Yes.
8    Q  Did the detective ask you any questions at
9 first?
10    A  When he first, he just said Mr. Holland,
11 where the knife at?  And I told him I didn't have a
12 knife and I went, I was explaining to him I was, I was
13 explaining to him what happened and he kept yelling,
14 hollering about where is the knife?  Tell me where the
15 knife at.  That's all he was, that's all he kept
16 saying.
17    Q  Okay.  When the detective spoke with you,
18 what was your behavior like?
19    A  I was calm.  I was calm.
20    Q  You were calm and you didn't swear at all?
21    A  No.
22    Q  Did the detective talk to Julia?
23    A  Yeah.  He talked to Julia, too.
24    Q  For how long?
25    A  I don't know how long.

90

1    Q  Now, you indicated that Mrs. Parker, when
2 they first were in line, was dropping stuff on the
3 floor, --
4    A  Yes.
5    Q  -- you thought, to entice you?
6    A  Yes.
7    Q  After that incident of dropping three or four
8 items on the floor, did she do anything else
9 throughout the night that you perceived as being
10 enticing with you?
11    A  No, because after that, she went and sat
12 down.
13    Q  Okay.  Just a moment, please.
14    MS. JOHNSON:  Okay.
15    Q  When you were hired in August 9, 2002, did
16 you --
17    A  Uh-huh.
18    MS. JOHNSON:  Yes?
19    Q  Yes?  You have to say yes.
20    A  Yes.
21    Q  Did you know Sulema Atkins personally?
22    A  Yes.
23    Q  Okay.  So before she hired you, you knew who
24 she was?
25    A  Yes.

91

1    Q  Okay.  And how well did you know
2 Ms. Atkins?
3    A  I knew her quite well because she was friends
4 with both of my sisters.
5    Q  Okay.  She was friends with your sisters, so
6 she knew about your problem with cocaine?
7    A  Yes.
8    Q  Okay.  Did she know, as far as you know, did
9 she know about your, any of your -- strike that.  Did
10 she know about your 1995 assault arrest?
11    A  No.
12    MS. JOHNSON:  Objection, foundation.
13    Q  How well did Ms. Atkins know your sisters?
14    MS. JOHNSON:  Objection, foundation.
15    A  She know them pretty well because she worked
16 with both of them.
17    Q  Would they see each other socially?
18    A  I think --
19    MS. JOHNSON:  Objection, foundation.  Go
20 ahead.
21    A  I think once, couple of times they had went
22 out and she had came over and we had a little
23 get-together, a picnic, cookout.  She came over a
24 couple of times.
25    Q  Now, how is it that you think Ms. Atkins knew

92

1 about your cocaine problem?
2    A  How?
3    Q  Yeah.  How do you think she knew?
4    MS. JOHNSON:  Objection, foundation.  Go
5 ahead.
6    A  For one, I never kept -- I don't lie to
7 people.  I never keep it from them.
8    Q  Did she, did you tell her that?
9    A  Yeah.
10    Q  While you were interviewing?
11    A  And then my sister, then she heard it from my
12 sisters.  And she tried, she was trying to help me,
13 maybe support me.
14    Q  What about Mr. Straybrooks, did he know about
15 it?  Is that his name?
16    MS. JOHNSON:  Claybrooks.
17    Q  Claybrooks.
18    A  Curtis?  No.
19    MS. JOHNSON:  David.
20    Q  David Claybrooks?
21    A  Oh, David?
22    MS. JOHNSON:  Yes.
23    A  No.
24    Q  And Curtis knew?
25    A  No.

DEPOSITION OF GEORGE HOLLAND
CONDUCTED ON MONDAY, MARCH 12, 2007

25 (Pages 97 to 100)

97

1    A   Yes.

2    Q   -- and brought you to speak to Ms. Johnson?

3    A   Yes.

4    Q   Okay. All right. Doing good here. Last

5    look. You started working in August of 2002 again for

6    McDonald's at the New York Ave. store?

7    A   Yes.

8    Q   And then at some point in time after that,

9    Julia Carter became a swing manager?

10   A   When she first started, she was a crew

11   person.

12   Q   So she was there when you were there in

13   August '02?

14   A   Yeah.

15   Q   She was a crew person just like yourself?

16   A   Yeah.

17   Q   Okay. And she became swing manager at some

18   point in time after that?

19   A   Yes. She had to go, she went to class and

20   everything for swing, swing manager class for that.

21   Q   Now, were you and her friends outside of work

22   at that time?

23   A   No. When she started there, that was the

24   first time we ever seen each other.

25   Q   And you didn't see each other outside of work

98

1    even as friends?

2    A   No.

3    Q   Okay. Do you know if she was aware of your

4    cocaine use?

5    A   No. I had not really talked to her about my

6    cocaine.

7    Q   Okay. At any time when she became swing

8    manager, did she have to discipline you for any

9    reasons?

10   A   Well, like I say, one time before that,

11   female customer came in and I said to another crew

12   person, you see how fat she is? And Julia turned

13   around and was, like, George, that's not professional.

14   Q   When was that? Do you recall?

15   A   I'm going to say it was like a couple of

16   months after she officially became a manager.

17   Q   Before your incident with the Parkers, had

18   you ever had any other incidents with customers?

19   A   No. That was the first time I ever had an

20   incident with a customer.

21   Q   Had you ever had any incidents with

22   co-workers before that date?

23   A   No, because I get along with everybody and

24   everybody know how funny, I mean, well, I'm not --

25   like, say, for instance, if I don't come to work, like

99

1    if I'm on my day off or whatever and then I come back

2    the next day, they be, like, man, where you been?

3    It's no fun without you because I laugh and crack

4    jokes on everybody. I'm just a fun person to be

5    around.

6        MR. BUTLER: Okay. I think that's all the

7    questions I have. Thank you, Mr. Holland.

8        THE WITNESS: You're welcome.

9        MS. JOHNSON: All right. Thank you, George.

10   Now, I have no further questions of you.

11       THE WITNESS: Okay.

12       MS. JOHNSON: And thank you very much for

13   coming down.

14       THE WITNESS: You're welcome.

15       MR. JOHNSON: Okay. We'll, we may have a

16   trial in the case in which case, we'll get you another

17   subpoena.

18       THE WITNESS: Okay.

19       MS. JOHNSON: And I'll send Mr. Kelly out to

20   find you if you're not where we need to find you,

21   okay?

22       THE WITNESS: Okay.

23       MS. JOHNSON: All right. So thank you so

24   much.

25       THE WITNESS: You're welcome.

100

1        MS. JOHNSON: Bye-bye.

2        THE REPORTER: Do you want him to read and

3    sign also?

4        MS. JOHNSON: Yes.

5        (Signature having been not been waived, the

6    deposition of GEORGE HOLLAND was concluded at 6:04

7    p.m.)

```
 1            IN THE UNITED STATES DISTRᵢ.

 2            FOR THE DISTRICT OF COLUMBIA

 3    -----------------------------x

 4    ANTOINETTE M. PARKER, et al.          COPY

 5            Plaintiffs         :

 6    v.                         :    1:05-cv-01782

 7    GEORGE E. HOLLAND, et al.  :

 8            Defendants         :

 9    -----------------------------x

10            Deposition of MICHAEL WHITE

11                 Washington, D.C.

12            Monday, March 12, 2007

13                    1:26 p.m.

14

15

16

17

18

19

20

21

22

23    Job No.:  1-99104

24    Pages:  1 - 48                  EXHIBIT

25    Reported by:  Linda Bahur, RPR      E
```

EXHIBIT
E


L.A.D.
REPORTING &

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF MICHAEL WHITE
CONDUCTED ON MONDAY, MARCH 12, 2007

30

1    they?

2        A    No, ma'am.

3        Q    They didn't lock him up for the knife either,

4    did they?

5        A    They locked him up and charged him with ADW.

6    That's assault with a deadly weapon, a knife.

7        Q    Okay.  But they never found the knife?

8        A    You don't have to find a knife.

9        Q    Just answer my question.

10       A    Okay.  No.

11       Q    They never found a knife?

12       A    They never found the knife.

13       Q    And the charge was dismissed, wasn't it?

14       A    I have no idea what happened to the charge.

15       Q    But you never went to court on it, did you?

16       A    I have no knowledge of what happened to the

17   charge.

18       Q    Let me ask it this way.  You never went to

19   court and had to testify in connection with this

20   charge?

21       A    Because it wasn't my case.  It was the

22   officers' cases.  I have nothing to do with the case.

23   I'm just the detective called to the scene.  That's

24   it.  I'm not the arresting officer.  I have so they

25   would never have called me to testify in court.