IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------x
ANTOINETTE M. PARKER, et al.:
Plaintiffs :
v. : 1:05-cv-01782
GEORGE E. HOLLAND, et al. :
Defendants :
---------------------------x

Deposition of GEORGE HOLLAND
Washington, D.C.
Monday, March 12, 2007
3:49 p.m.

Job No.: 1-99104
Pages: 1 - 104
Reported by: Linda Bahur, RPR

Deposition of GEORGE HOLLAND, held at:
Bonner Kiernan Trebach & Crociata, LLP
1233 20th Street
Suite 800
Washington, D.C. 20036

Pursuant to agreement, before Linda M. Bahur, Registered Professional Reporter and Notary Public of the State of Maryland.

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
WILLIAM BUTLER, ESQUIRE
THOMAS V. MILLER, JR., P.A.
8808 Old Branch Avenue
P.O. Box 219
Clinton, Maryland 20735
(301) 856-3030

ON BEHALF OF DEFENDANT RARDIN ENTERPRISES:
D'ANA JOHNSON, ESQUIRE
BONNER KIERNAN TREBACH & CROCIATA, LLP
1233 20th Street, N.W.
Suite 800
Washington, D.C. 20036
(202) 712-7000

Also present: David Rardin

CONTENTS

| EXAMINATION OF GEORGE HOLLAND | PAGE |
| --- | --- |
| by Ms. Johnson | 5 |
| by Mr. Butler | 41 |

EXHIBITS

(No exhibits marked)

Q Okay. Ninth grade?
A **Yes.**
Q Did you ever go back and get your GED?
A **No.**
Q Did you ever go back to school at all after that?
A **No.**
Q Now, I served you with a subpoena, didn't I?
A **Yes.**
Q And that's why you're here?
A **Yes.**
Q You didn't come down just voluntarily. It's because you got a subpoena and you got a witness fee check that went along with that, right?
A **Yes.**
Q Okay. And I made arrangements for someone to pick you up and actually deliver you here, didn't I?
A **Yes.**
Q And that's part of how you got here today; is that right?
A **Yes.**
Q All right. Now, tell me when you first started working for McDonald's restaurants, your first job at McDonald's.
A **Was 198 -- it was either '82 or '83.**

Q Where was that?
A **New York Avenue.**
Q The one we're talking about here?
A **Yes. It's when it was first built.**
Q And who owned it at that time?
A **It was corporation at that time.**
Q Do you know who the head man was at the corporation?
A **No.**
Q Who was your boss at the time?
A **My sister. Her name is Sandra Holland.**
Q Your sister worked there?
A **Yes. She was the store manager.**
Q Any other members of your family work for McDonald's over the years?
A **I still have a sister that works for McDonald's.**
Q Where is she working?
A **Bladensburg, Maryland.**
Q And what's her name?
A **Delores. I don't know her married name but her maiden name is Holland.**
Q And what does she do for McDonald's?
A **She's a cashier.**
Q Is she a swing manager?

A **No. She was a manager but she gave it up.**
Q So she's a cashier now. You told me she works at Bladensburg?
A **Yes.**
Q Have you had any jobs in your life other than from McDonald's?
A **I worked for Wendy's. I used to work for CPF Cleaning Company. I worked for another cleaning company called National and I worked for Hardee's at the bus station. Used to be Hardee's at the bus station. I forget the name of it.**
Q Would I be right in saying then that your jobs have either been food service or with the cleaning companies?
A **Yes.**
Q All the kinds of jobs that you've done?
A **Yes.**
Q Do you have sisters and brothers other than the two sisters that you've told me here?
A **I have four more brothers and three sisters.**
Q Are your parents living this area still?
A **Both of my parents are deceased.**
Q Are your sisters and brothers, other than Sandra and Delores, are they living in the area?
A **Well, Sandra and Delores and my brother James**

**and my brother Tyrone and I've got two more siblings, no, three more siblings that live in Rocky Mount, North Carolina.**
Q Is that home for the family, Rocky Mount?
A **Actually, it's not Rocky Mountain. It's Charlotte, North Carolina.**
Q Have you ever been in the military?
A **No.**
Q You ever been convicted of any crimes?
A **Not convicted, no.**
Q You've been charged with crimes but not convicted?
A **Yes.**
Q And I don't want you to take this question the wrong way. Have you ever lived outside of D.C., Maryland or Virginia?
A **No. I've been living in D.C. all my life.**
Q So you never lived in Maryland actually?
A **No.**
Q You ever been treated for substance abuse?
A **I was, I went through two programs.**
Q When was that?
A **The first one was in 1996.**
Q What was that one for?
A **Cocaine.**

maximum, sometimes a year-and-a-half, and then you'd leave and go do something else?
A Yes.
Q And then come back to McDonald's?
A Yes.
Q And when you left to do something else, what did you normally go do?
**A Cleaning company.**
Q Okay. So you were either working at the McDonald's or going, working at the cleaning company?
**A Yes.**
Q All right. In connection with this incident, when was it that you came to McDonald's before the 2004 incident? How long had you been working there?
**A Before the incident?**
Q Yes.
**A I was, I think I started back in 2003.**
Q Well, we've got an application that says you started in August of 2002. Would that be right?
**A Probably right. 2002.**
Q Take a look at those documents that are marked there.
**A Yes, that's right. I was living on Anacostia Road. Me and my wife was living on Anacostia Road.**
Q Let me show you this and ask you, take a look

through here and see, it says August 9th of 2002. I'm going to show you this page. It talks about you certified that's your signature below, indicating that you read all of that. Does that refresh you when you came back to work at the McDonald's on --
**A Yes, yes. That's about right.**
Q 2002, August 9, 2002?
**A Yes.**
Q On August 9, 2002, when you came back to work at the McDonald's, you knew all about all the policies, no weapons, get terminated?
**A Yes.**
Q No drugs, get terminated?
**A Yes.**
Q No abusing, no punching the customers, get terminated, right?
**A Yes.**
Q You knew all that, right?
**A Yes.**
Q You were well aware of those things, right?
**A Yes.**
Q All right. Tell me what happened on September 14, 2004 as you remember it.
**A Okay.**
Q I'm sorry, September --

MR. BUTLER: 15th, yeah.
Q -- 15, 2004. You know what we're talking about, right?
**A Yes, the incident that happened between me and the defendant, the plaintiff.**
Q Yes.
**A Okay. That night, I was in the grill section with another crew person. My manager, Julia, she was on the front line because she was the cashier. We had no cashier that night and the other manager, Curtis, was in the office and the plaintiff and his wife walked in to order their food.**
**Me and the crew person that was in the grill section with me, we was, we noticed the plaintiff's wife and we was looking at her and I guess she noticed we was looking at her back. And to me, it seems like she noticed that we was, well, we say checking her out. And she dropped something on the floor about once or twice and kept looking back at us like she know that we was looking at her. And then she went to sit down and her husband was still in line ordering the food and after he ordered, he went to sit down with her and put his arm around her like to let us know that he was with her.**
**So Julia asked me could we close the inside**

**at 10, and the drive-through stay open until 11. She asked me to go lock the doors. Another customer in line. I'm not sure if it was a bus driver or a DPW driver. And I'm standing there and I had the locked, waiting for them to leave. So when the other customer, on his way out, he tapped me on the arm and point at the plaintiff's wife and say she got a fat behind, and I said yes.**
**So the plaintiff turned around and said man, that's disrespectful. So the other customer that was on his way out said, who are you talking to? He said, I'm not talking to you, I'm talking to him. So he said when you and the main man was back in the grill section, I didn't say nothing when y'all was checking my wife out, but man, that is real disrespectful. I said, man, I'm not trying to hear that. My manager asked me to lock the door and that's what I'm doing, so.**
**The other customer left and I think they was waiting on fries, so they was still in line. Their fries came out about five minutes later after that and on the way out, as they was leaving, I had the door open for them to walk out and he walks up to me like this.**
Q What's "like this" mean?

A He approached me. He got close up in my face.
Q Couple inches from your face?
A Yes. And he's, like, what's up now? So I shoved him back. So he came up to me the second time and I took my palm of my hand and smooshed him in his face and at that time, I can say that it probably about to get physical. That's when his wife grabbed him. And Julia and Curtis, the other manager, came from behind the counter and grabbed me because we was about to have another altercation. So Julia made me go back behind the counter and she was standing there talking to him.
Q "Him" meaning Mr. Parker?
A Yes, Mr. Parker. So as they went out, he left and Julia locked the door and she came back and said that she wanted him, he wanted her to call the police because I assaulted him. Then I guess he sat in the parking lot on his cell phone and called the police because about five or ten minutes after that, the police came knocking on the door and they came in and asked what was going on, so I told him what happened. Julia told him what happened and they said that he say that I had pulled a knife and I told him I didn't have no knife.

So the police went back out to talk with him and his wife again. Then about another two minutes, the police came back in and said that there was a detective on the way. But at that time, I knew that I had a warrant out on me for violation of my probation and when the detective, he kept asking me, Mr. Holland, where the knife at? And I kept telling him I don't have a knife but he just kept saying, Mr. Holland, where's the knife? And I just kept telling him I didn't. They took my social security number down and called it in and then I asked him what was they locking me up for? And he never said what he was locking me up for. He just said, we're going to let the judge decide that in the morning, but I already figured it out. The reason he only locked me up is because when they called my social security number in, I had the bench warrant.
Q All right. All right. Now, who was the other crew man working with you?
A I can't remember his name.
Q Okay. Did you ever shout out loud at Mrs. Parker?
A No.
Q Did you ever shout out loud and make a real loud, you know, real loud, like man, she's fat, she's

this or anything, make any comments to her really out loud?
A No, I never done that at all.
Q Did you say anything out loud about her?
A No.
Q To the other guy or to anybody?
A No. Me and the other crew person, we never, we were saying something about that but we never shouted it out and we was like -- he said, like, come here. He's, like, man, she's fat. I ain't going to say exactly what he said.
Q He was commenting on her body?
A Yes, but we never said anything out loud to where they can hear us.
Q Were you out in the area close to the front counter or were you in the back?
A No. We was in the back with the grill section in the kitchen. In the kitchen.
Q In the kitchen area?
A Yes.
Q How far is that from the front counter?
A I'm going to say like about five feet.
Q Okay. Is there anything to block your view from the, or to block the traveling noise from floating out or going out?

A Well, we got the bin, the bin like where you put the food where they had at the time where you slide the food in, put the food down, and the fry station is on this side, fry station, and the little walkway in between. There's another table right there where we work on.
Q So there were things in front of the area where you and this other crew person were talking?
A Yes.
Q And were you talking real loudly?
A No. We don't talk loud. We don't talk real loud.
Q Where Julia was at the front desk, I mean, at the front counter.
A Yes.
Q Yes?
A Yes, she was at the front counter.
Q Did she hear you talking?
MR. BUTLER: Objection.
A No.
Q How do you know that?
A Because if she would have heard, she would have said something.
Q What would she have said?
A I know Julia well. She would have turned

A No.
Q Have you ever talked with David Clayborn about what happened that night?
MR. BUTLER: Claybrooks.
Q Claybrooks. I'm sorry?
**A No, because when I was locked up, I had my wife contact him to ask him when I got out was my job still secure? And he was just, and he told her yeah, if he would be there because they were selling the store, but when I came when I got with Tony, I know Tony anyway, Tony hired me back.**
Q So it wasn't David Claybrooks that hired you back?
**A No. It was Tony. David wasn't there. That store had already been sold. David stayed with the old company.**
MS. JOHNSON: Okay. All right. Thank you, Mr. Holland. I have no other questions.
THE WITNESS: Thank you.
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:
BY MR. BUTLER:
Q Okay. Mr. Holland, my name is William Butler. I work at the law firm that represents the Parkers in this case and I'm going to ask you a few follow-up questions.

**A Uh-huh.**
Q Okay? Are you still married?
**A Yes, but we're not together.**
Q What is your wife's name?
**A Sabrina.**
Q Sabrina?
**A Niblett.**
Q I'm sorry?
**A Niblett.**
Q Niblett?
**A Yes.**
Q And when were you married?
**A Well, we're not legally married. It was common law. We've been together for 13 years.**
MS. JOHNSON: Remember, I told you you're going to have to keep your voice up?
THE WITNESS: Yes.
MS. JOHNSON: Talk like I'm talking to you. You're going to have to do that now, okay?
THE WITNESS: Okay.
BY MR. BUTLER:
Q And how many children do you have with Sabrina?
**A I have one daughter.**
Q Have you ever been married, legally married?

**A No.**
Q Do you have any other children?
**A I have an older daughter.**
Q How old is your older daughter?
**A Fifteen.**
Q And how old is your younger daughter?
**A Six.**
Q And the six-year-old you have with Sabrina?
**A Yes.**
Q Who do you have the 15-year-old with?
**A Her name's Cynthia Jackson. She's deceased.**
Q Jackson. Do you have any other children other than that?
**A No. Those are the only two.**
Q Do you pay child support?
**A I was when I was working.**
Q Have you ever been in arrears of your child support? You do know what that means?
**A In arrears?**
Q Yes.
**A Yes.**
Q Behind?
**A Yes.**
Q How much are you behind in your child support

currently?
**A Last time I checked, it was, like, $6,000.**
Q Have you ever been put in prison because of being behind in child support?
**A Yes.**
Q How many times?
**A Once.**
Q So when was that?
**A When I got locked up for the incident at McDonald's and my 90 days, well, when my 90 days was up, child support held me over.**
Q Held you over?
**A Yes.**
Q Okay. You got arrested by McDonald's.
**A Uh-huh.**
MS. JOHNSON: No, no, not by McDonald's.
Q I'm sorry. When you got arrested that night, September 15, 2004, you said that there was a warrant out, bench warrant?
**A Yes.**
Q And you violated probation?
**A Yes, violated probation.**
Q Did that stem from a child support issue?
**A No. That was from a domestic violence.**
Q And what were the circumstances regarding

domestic violence? When did that occur?
A **So many.**
Q I'm sorry, what did you say?
A **There was so many.**
Q So many?
A **More than one time, domestic violence me and my wife have been into.**
Q You're talking about Sabrina now, your common law wife?
A **Yes.**
Q How many instances of domestic violence have there been?
A **Actually, in the whole 13 years we were together.**
Q How many times have the police had to come to your house?
A **I'm going say about 20, 25 times.**
Q Twenty to 25 times?
A **Yes.**
Q How many times have you been arrested as a result of those 20 to 25 visits?
A **Every time. Well, no, no, not every time. Say about four, five times.**
Q Just four or five times?
A **Yeah.**

Q And where do you take -- when they arrest you, where do they take you?
A **Well, last time we was living in Anacostia Road. That's the sixth district.**
Q They take you to the station?
A **Yes.**
Q And for those four or five times, how long do you have to stay in prison?
A **Overnight.**
Q Overnight? And do you always get out the next day?
A **Yes.**
Q As a result of any of those 20 to 25 times, has Sabrina ever followed through with the charges?
A **No.**
Q So the charges are always -- well, did she ever bring charges?
A **No, not -- no. It was always -- well, she had dropped them but they say the district attorney pick it up.**
Q Okay. And I'm not an attorney in that area so bear with me. She calls the police, they come?
A **Yes.**
Q They take you away?
A **Yes. She might go down there and might put a**

**stay away order on me, then we get back together and she'll take it off.**
Q How many protective orders has she filed against you?
A **About three.**
Q Were you ever in jail longer than a day or longer than overnight for domestic violence?
A **No.**
Q Okay. Then the warrant, you indicated the warrant that was out the night you got arrested, September 15, 2004 --
A **Yeah, because I was supposed to be -- actually, I was supposed to be taking urines and going to see my probation officer.**
Q Okay. Why were you are supposed to be seeing your probation officer?
MS. JOHNSON: It was domestic violence?
A **It was domestic violence with me. See, because in jail, they put me on probation.**
Q Okay. He gave you probation for one of the counts of domestic violence?
A **Yeah.**
Q What year was that that you went on probation? Do you recall?
A **I want to say it was either '02 or '03.**

Q Okay. So either in 2002 or 2003, you were arrested on domestic violence charges?
A **Uh-huh.**
Q And went before a judge?
A **Yes.**
Q Were you represented at the time?
A **Yeah. I can't remember the attorney's name.**
Q The private attorney?
A **It was a court-appointed attorney.**
Q Was it a public defender or just a court-appointed?
A **Public defender. You know when you go to court and you don't have a lawyer?**
Q Yes. And he represented you. Was there a trial or was there a plea?
A **There was a trial.**
Q So you went to trial before the judge?
A **Yeah.**
Q And your common law wife Sabrina testified against you?
A **She came to court once and dropped the charges.**
Q During the incident where you went to trial with your attorney, she came to court and testified against you?

and object. Based on what he told us, he may have been a juvenile at the time. He was born in '67. In '84, he would have been 17. So I don't know.
Q Were you a juvenile at the time?
**A Yes.**
Q Of that charge?
**A Yeah.**
MS. JOHNSON: So that's not admissible.
Q But you pled guilty to that?
**A Yeah.**
Q And they gave you a year's probation?
**A Yeah.**
MS. JOHNSON: Yes?
**A Yes.**
Q Yes?
**A Yes.**
Q Now, after 1985, did you have any more arrests for drugs?
**A No, no.**
Q Are you sure of that?
**A Positive.**
Q So other than -- what about before 1985?
MS. JOHNSON: Objection. That's a juvenile record. It's not admissible.
**A That was my first time of being arrested.**

Q That was your first time, you said, in 1984, 1985?
**A Yes.**
Q Do you remember 1985, or whether it was '84 or '85?
**A It was '85. I'm not quite sure of what year.**
Q Was that in D.C.?
**A Yeah, it was in D.C.**
Q Do you remember if you went to juvenile court or went to D.C. Superior Court?
**A D.C. Superior Court.**
Q So other than that first time being arrested for selling cocaine to an undercover police officer and the 1994 or '95 assault charge against the man that was in the apartment building and the domestic violence issues and the incident at McDonald's on September 15, 2004, can you recall any other arrests?
**A No.**
MS. JOHNSON: Objection.
**A No.**
Q Now, I think you've reviewed this document which is Exhibit Number 2, Rardin, didn't you?
**A Yes.**
Q And when you applied in August of 2002 to McDonald's, there was a question as to whether or not

during the past seven years, you'd ever been convicted of or pled guilty to, no contest to a crime excluding misdemeanors and traffic violations?
**A I put no.**
Q You put no because, in your opinion, between 19, I guess it was 1995 and 2002, you had never been convicted of a crime?
**A No.**
Q Okay. You had given us a fairly long list of stints with McDonald's over the years. I guess starting in 1983, you said that you worked for, between '83 and '85, the New York Ave. branch where the incident took place; is that right?
**A Yes.**
Q And you left there in 1985 or thereabouts. Do you recall the reason why you left there at that time?
**A No. I don't know. I'm not quite sure.**
Q Okay. Well, if you started there in '83 and left there '85, that was about the time that you got arrested for the cocaine selling?
**A Yes. I was working there and selling drugs at the same time.**
Q You were working at McDonald's and selling drugs at the same time?

**A Yes.**
Q And did your manager of McDonald's at that time know about your arrest for the selling of drugs?
**A No.**
MS. JOHNSON: Objection.
**A No.**
Q Okay.
**A Oh, yes, yes, because it was my sister. My sister.**
Q Oh, your sister was the manager?
**A Yes.**
Q And why did your employment come to an end at that time, the first time you left?
**A I just left.**
Q You just left on your own?
**A Yes.**
Q But you returned, it says, in 1987?
**A Yes.**
Q And worked another one-and-a-half years until about 1989?
**A Yeah.**
Q And do you recall which store that was at?
**A It was the same one, New York Avenue.**
Q New York Avenue? Was your sister still the manager?

**somebody manage your money and you want some money and they won't give it to you.**

Q So you've had a problem with that since 2002?

**A What, cocaine?**

Q Cocaine.

**A Since '86.**

Q '86, but you've cleaned up after 2001 for 30 days?

**A Yeah.**

Q But then 2002, you fell into the wrong crowd, you said, again, and since 2002, you've got a problem with cocaine?

**A Yeah.**

Q Are you still doing the other drugs as well, the alcohol and the weed?

**A I drink beer. I might smoke a joint of weed every now and then.**

Q But still, the cocaine is the one you have trouble controlling?

**A Yeah.**

Q Okay. And there haven't been any arrests for drug use since 1985?

**A No.**

Q How many times have you been locked up for child support?

MS. JOHNSON: I think you asked and answered that. Go ahead.

**A Twice.**

Q Just twice? Give me just a moment here. Let's get to the incident of September 15, 2004.

(Discussion off the record.)

Q All right. I think we're getting to September 15, 2004. When I refer to that date, that's the date we've been talking about today, the date the incident allegedly occurred with the Parkers?

**A Yes.**

Q You were working that night as a grill --

**A Person.**

Q Person? Thank you.

**A Yes.**

Q And your shift would have been from about, from what I understand, 4 p.m. until closing?

**A No, 3 until 11.**

Q Just 3-to-11?

**A Yes.**

Q So at 11 p.m.?

**A Well, actually -- well, yes, yeah, we close later. When they say 3-to-11, actually, we're still in there after 11 cleaning up.**

MS. JOHNSON: You have to keep your voice up

so she can hear you.

**A Actually, we're still in it after 11.**

Q Until the work gets done basically?

**A Yes.**

Q You indicated that that night you were working the grill --

**A Yes.**

Q -- with a co-worker whose name you don't remember?

**A No.**

Q And the Parkers come in the restaurant together?

**A Yes.**

Q Do you recall about what time of the night that was?

**A It was, I know this was like 9:50, 9:55. Like I say, we close the doors at 10.**

Q Okay. So they got in just before closing?

**A Yes.**

Q And they came into the restaurant?

**A Yes.**

Q And at that time, you noticed Mrs. Parker?

**A Yes.**

Q Okay. And you said something to your co-worker?

**A Yes.**

Q That --

**A Yeah. We both said something to each other.**

Q But you said it in a manner where only your co-worker could hear it?

**A Yes.**

Q And what was it you said to the co-worker?

**A Well, I said to him, I said, do you see the fat behind on her?**

Q Now, let's talk about fat. When you use the term fat, are you talking about F-A-T as in unusually big or do you mean P-H-A-T as in --

**A P-H-A-T.**

Q -- very nice?

**A Very nice.**

Q Okay. So you said that to your co-worker and what did he say in response?

**A And he said she has some nice boobs. Well, he, he didn't say it in that manner but --**

Q Okay. Now, did you have any reason to believe at that point that the Parkers could hear what you were saying?

**A No, but I know that he know that we was talking about her because when you're talking about someone and you're looking at them, you know that a**

**person is talking about you.**
Q Well, did you kind of nudge your co-worker as you were talking?
A **Yes.**
Q You were nudging and looking over there?
A **Yeah, we was looking at her, looking at the counter and looking at her.**
Q You weren't pointing, were you?
A **No, no, we weren't pointing. We was just looking.**
Q How big is the space that you can look through?
A **Well, the counter, it's about this high.**
Q Okay. Motioning about five feet high, the counter?
A **Yes.**
Q So you have to look -- the counter goes the whole length of the --
A **Yeah, the grill.**
Q Okay. But other than the counter, there's nothing above the counter to prevent you from seeing?
A **No.**
Q Okay. Now, at that time you said those first initial words, you didn't think that they heard you but you thought maybe Mr. Parker saw you looking?

A **Yeah.**
Q What did the Parkers do? They kept coming in the restaurant and got in line?
A **Yeah, they got in line and Mrs. -- they was talking when they were next door. He was standing -- this is Mrs. Parker and this is Mr. Parker standing on this side, and she looked up. Like I said, to my understanding, that when you know a person is talking about you and looking at you, checking you out, and to my understanding, like she knew. And like I say, she dropped something on the floor like three or four times, bending over.**
Q This is just after they entered the store?
A **Yeah.**
Q She's standing next to her husband, Mr. Parker, in line waiting to be, place their order?
A **Yes.**
Q With Ms. Carter who is --
A **The cashier.**
Q -- swing manager but doing the cashiering that night?
A **Yes.**
Q So they just entered the store and in your opinion, they were waiting in line. Mrs. Parker knew that you and your co-worker were looking at her?

A **Yeah.**
Q So she was purposely dropping things on the floor?
A **Yes.**
Q To?
A **What can I say? Entice.**
Q You would say entice? To entice you to look more?
A **Yes.**
Q Now, do you know what the items were that she was dropping on the floor?
A **I don't know. No, I don't know exactly what she dropped.**
Q But it was three or four times?
A **Yes, about three or four times.**
Q Now, when she would drop the item, how would she pick it up in a way that you thought enticed you?
A **When she dropped, like when she dropped it, she bent over like this to pick it up.**
Q Okay. Motioning to the floor?
A **Yes.**
Q Bending straight at the waist?
A **Yes.**
Q Without bending her knees?
A **Yeah.**

Q And that happened three to four times?
A **Yes.**
Q When she got back up from picking it up, did she do anything? Did she look over in your direction?
A **She looked over in our direction as to say, it was like she knew we was looking.**
Q Did she have any particular expression on her face?
A **She had like a little, like nice little smirk, like a smirk, like.**
Q She was smirking at you after she would pick the items off the floor?
A **Right. And then after that, she went and sit down.**
Q Hold on. We're going to get to that. We need to take this step by step, at least until 6:15. Who else was in line in front of the Parkers, if anyone?
A **They came in and then after they came in, that's when, I would say he was a metro worker or DPW worker.**
Q Was there anyone in front of them in line?
A **No. They was in there because before they came in, we had no customers in line.**
Q And after, and as they were placing their

order, did you say anything to Mrs. Parker?
A No. Never at any time did I say anything to Mrs. Parker or Mr. Parker.
Q Hold on. We're going to get to that any time. We're just talking about when they were standing, placing their order with Ms. Carter at the counter. You didn't say anything to them at that time?
A No.
Q And did Mr. and Mrs. Parker say anything to you while they were placing the order?
A No.
Q So they placed their order and got their food?
A Well, they have to wait on fries.
Q Okay. But they got most of their food?
A Yeah.
Q And then they went and sat down and ate?
A Yes.
Q While they were sitting and eating, did you say anything about Mrs. Parker?
A No. I just kept looking out.
Q You just kept looking out there, checking her out?
A Yeah.

Q Okay. And what were the Parkers doing while you were doing that?
A They were sitting there talking, laughing.
Q Okay. Now, at what point when they, between them entering the restaurant together and sitting down to eat, at what point in your mind did you realize that they were together as a couple?
A Well, she sit down before he did and he was standing there, waiting to pay for the food.
Q Okay.
A And then after he paid, he still had to wait a few seconds before his sandwiches and stuff was ready and went over there to sit down with her, he hugged her as to let us know that they was together.
Q So once he sat down with her and put his arm around her, that's when, in your mind --
A He hugged her and looked back there at us to let me and my co-worker know that he was with her.
Q And is that when you knew they were together as a couple?
A Yeah.
Q For the first time?
A Uh-huh.
Q Okay. Now, what happens then? They eat their food?

A They're still eating their food and it's like the other dude, he's waiting for his food. This is like 10:05 or something like that. And Julia asked any to come from behind the counter, lock the door and stand there until they got ready to leave. So the other customer gets his food and on the way out the door, Mr. and Mrs. Parker goes back up to the counter for something else and the customer nudged, taps me on my arm and said man, you see the fat little behind on her?
Q Okay. Let me stop you there. This is the DPW or the metro --
A Uh-huh.
Q -- individual? So he's got his good. He's not going to eat there. He's getting his food to leave?
A To leave, yeah.
Q And you go over to let him out?
A Well, I was standing. I was already standing.
Q You were already standing there because you had to lock, to keep people in from coming in after hours?
A Yes.
Q So you had to let him out?

A Yes.
Q And he was the one who tapped you?
A Yes, on his way out.
Q And he used that same phrase?
A Yes.
Q Phat, look at the P-H-A-T ass on her?
A Yes.
Q Meaning Mrs. Parker?
A Yes.
Q And this was as they were, the Parkers were approaching?
A Coming. They was back at the counter for, I think they had ordered something. I'm not quite sure. Apple pie or something.
Q They were getting something just before they were ready to leave?
A Yes.
Q And what did you say when the DPW or metro worker said that to you?
A I looked at her again and I said yeah, she do have a fat behind on her. I didn't say it out loud.
Q You just said it to the other customer?
A Yeah.
Q The DPW worker or metro worker?
A Yeah. And I turned around and looked at her

77

**again when he tapped me, tapped me on the arm and said that, and that's when Mr. Parker was like, man, you're real disrespectful. The other customer --**
Q Let me stop you there. As you said that back to the customer, the DPW or metro worker at the door, do you think Mr. Parker heard you say it at that time?
**A He might have. I don't know. I'm not going -- I mean, I didn't said it real loud-loud.**
Q How far away from you were the Parkers at that time?
**A About five to ten feet.**
Q So about as far away as you are from Ms. Johnson?
**A Yeah.**
Q Okay. So estimating about five, six feet?
**A Yes.**
Q Okay. So at any rate, whether or not you said it loudly or not, you think Mr. Parker heard you?
**A Yeah.**
MS. JOHNSON: Objection.
**A Either he heard or he knew, I mean, he knew I was, we was talking about his wife.**
Q He knew what you were doing or he heard you?
**A Yes.**
Q So he came over and I think you already

78

testified to this, got up real close to you?
**A That was on their way out.**
Q Oh, we're not there yet?
**A No.**
Q He didn't come up to you on -- they're not out of the building yet?
**A No.**
Q I'm sorry. He heard that and what did he say?
**A He went, he was, like, man, you're real disrespectful, man. That's my wife. I didn't say nothing to you when you were on, main man was behind the counter looking at her. But man, that's real disrespectful. The customer that was on the way out said, who was you talking to? He said, I'm not talking to you, I'm talking to him, pointing to me.**
Q Right.
**A And I turned around. I was, like, who you talking to? Me? Like that. I was, like, man, I'm not trying to hit at. I'm just, my manager asked me to lock the door. He's steady going all cursing me out so I just ignored him, let the customer out and locked the door and waited for them to come out.**
Q Because he was, you said he was saying these things from about six feet away near the counter?

79

**A Uh-huh.**
Q Getting whatever it was he needed to get before he left?
**A Uh-huh.**
Q Okay. For how long --
MS. JOHNSON: Yes, yes, yes?
Q Yes?
**A Yes. Sorry.**
Q Thank you. And did you -- how long was he at the counter waiting for the additional items?
**A No more than about two, three minutes.**
Q Then the next thing that happens, you said you're just letting people out. He gets his item and then what happens?
**A Gets his item and they are walking toward the door where I'm at and I unlock the door and open, because it's a little vestibule.**
MS. JOHNSON: Vestibule.
**A Yes, vestibule, because it's that door and then an outside door right there.**
Q Sure, breezeway.
**A Yeah.**
Q Or an atrium --
**A Yeah.**
Q If you will. Okay.

80

**A So I open that door, the vestibule door, to let them out and he gets up in my face. It was, like, what's up now? And I shoved him.**
Q Okay. So when he gets up in your face, he gets real close?
**A Yeah.**
Q He doesn't touch you?
**A Yeah. I mean, he's like --**
Q He gets real close?
**A Well, we touched like this.**
Q Your chests?
**A Yeah. He's, like, what's up now?**
Q Okay.
**A And I shove him. I take both of my hands --**
Q You didn't say anything when he said what's up now?
**A No. I just take both of my hands and I shove him back.**
Q Okay. And then what's he do?
**A The second time he come up, so I take the palm of my hand and I smoosh his, I'm in his face like that.**
Q Okay. And at this point, at no point did he put his hands on you?
**A No.**

Q Okay. Now, Mrs. Parker is waiting just inside the door in the --
**A She's standing, like, next to him.**
Q Oh, standing next to him?
**A Yes. And after the second time when I smooshed him in the face, then I think that's when he was bothered and really put his hands on me. She grabbed, she grabbed him and pulled him out the door and said, come on, and my managers run from behind the counter.**
Q Who is that?
**A Julia and Curtis.**
Q Okay. Did they --
**A Run from behind the counter and grabbed me.**
Q If you know, do you know if Julia saw you push Mr. Parker?
MS. JOHNSON: Objection. Go ahead.
**A I'm not going to have to say if she did or she didn't because I know she was still standing over there where on the counter at. I don't know exactly what she was doing.**
Q Okay. But there were no more customers left in the store besides the Parkers, right?
**A No. Those were the only two customers.**
Q All right. So Julia and who else ran around?

**A Curtis.**
Q Curtis together?
**A Yes.**
Q And who grabbed you?
**A Curtis.**
Q Curtis?
**A Curtis grabbed me. Julia, I think, if I'm not mistaken, Julia asked Curtis to grab me and take me behind the counter.**
Q What was Julia doing?
**A She was talking, she was trying to get Mr. and Mrs. Parker, trying to talk to them and calm them down.**
Q Okay. Now, at any point, as Mr. and Mrs. Parker came to you toward at the door, at any point did you raise your voice?
**A I asked him what was up after the incident happened.**
Q Well, he said what now?
**A And I said --**
Q Pushed him in the chest.
**A I pushed him in the chest and then I thought and I said what's up?**
Q Okay. And did you yell that?
**A Yeah. My voice got a little bit loud.**

Q Okay. So you yelled what's up?
**A Yeah.**
Q After you shoved him twice?
**A Yeah.**
Q At any time, up to that point, did you use any swear words?
**A No. I never sweared.**
Q You never swore that night or you don't swear in general?
**A No, I never swore that night. I'm not going to say I don't swear in general.**
Q So at no point during the entire night would you use a swear word?
**A No.**
Q Now, the second pushing was a push with your hand to Mr. Parker's face?
**A Yes.**
Q And then he was pushed back?
**A Yes.**
Q Then he came forward again?
**A Yes.**
Q Is it at that point --
**A As if he was going about to grab me or something.**
Q And then is it at that point that Curtis came around?

**A Curtis and Julia.**
Q They came around and grabbed you?
**A Yeah.**
Q Okay.
**A I don't know. I guess, to my opinion, I don't know if he thought that by me being shorter than him and he being taller than me, that I was supposed to be intimidated.**
Q Okay. But you were not intimidated by him?
A No.
Q Okay. How did Mr. Parker make you feel?
**A He made me feel like nothing. I mean, I wasn't scared. He make me feel -- I wasn't scared.**
Q You were not scared?
**A No. I was, when I was brought up, I was always brought up to be, my father and my grandfather always tell me the bigger you are, the harder you fall.**
Q And what were you feeling when he came up to you near the exit?
**A When he came up to me? I was standing there just waiting to let them out. I wasn't really thinking about what he was saying or nothing. I was just standing there trying to do my job.**

Q Okay. That night, September 15, 2004, do you recall if you had taken any cocaine?
**A No.**
Q No, you don't recall or you did not?
**A I did not.**
Q Well, how many times per week were you using cocaine at that time?
**A How many times per week? I only used it, I only used when I got paid.**
Q How often would you get paid?
**A We get paid every two weeks.**
Q Okay. So you would use it once every two weeks?
**A Yes.**
Q On pay day?
**A Yes.**
Q What day was pay day around September 15, 2004?
**A It was that day. We got paid that night.**
Q You got paid that night and when were you planning on using cocaine that night?
**A When I got off.**
Q Right when you got off work?
**A Right.**
Q But not before?

**A No.**
Q Where was your cocaine contact that night?
MS. JOHNSON: Object.
Q Where would you have to go to buy it?
**A I have different places all over town.**
Q Okay.
**A I know it's various different places to go get it.**
Q Any places near your work?
**A Yes, a couple places.**
Q How far?
**A But I never used, I never would go get cocaine and come to work and use it.**
Q You weren't scheduled to work the next day?
**A What was that, a Friday?**
Q It was pay day.
**A Yeah, I was scheduled. Yeah, I was scheduled to work that day.**
Q Okay. At any point in time, did your cocaine providers come to you?
**A No.**
Q No? You'd always have to go to them?
**A No. I never have anybody come up, come up to my job.**
Q Now, after, well, you said you got grabbed.

At any point did you stick your head outdoor, outdoors and yell at the Parkers?
**A No, because after the incident happened, like I say, Curtis and Julia came around and Curtis took me behind the counter and Julia was the one that actually let them out outside.**
Q Okay. So you never made it out to the atrium at all?
**A No.**
Q Okay. I think you indicated earlier what happened was that you got back inside and somebody called the police. The police came?
**A Yeah. I think Mr. Parker sat outside in his car.**
Q And they came in, the police came into the building and talked to you and Julia?
**A Yeah, and asked us what was going on and said that --**
Q Hold on. The police that came in, how many police officers were there?
**A One police officer.**
Q One police officer?
**A I think the other officer was still outside talking to the Parkers.**
Q Okay. And the police officer that came in,

was he in a police uniform?
**A Yes.**
Q So he was a, I forget the word. He had a police uniform on?
**A Uniform on.**
Q Uniformed officer. For how long did he talk to Julia?
**A I'm not quite sure how long he talked to Julia.**
Q Okay. And he talked to you?
**A Yeah. He talked to me, too, and he also talked to Curtis.**
Q Okay. And at this point, what was your demeanor like? Do you know what I mean by that?
**A No.**
Q How were you were behaving? Were you calm?
**A When the police officer --**
Q Yes, when the police came in to talk to you.
**A I was calm. I wasn't frightened.**
Q And then at some point, did another police officer come in and talk to you?
**A No. They called a detective.**
Q A detective came in to talk to you?
**A Yes. When the detective came, they called. I was in the back cleaning up and they called me out**

in the lobby and he was asking me where was the knife? And I said, I didn't have no knife. And as he was talking to me, at that time, it was two uniformed police. One was standing on each side of me and they taking my stuff out of my pocket.
Q They searched you?
A Yes.
Q Did the detective ask you any questions at first?
A When he first, he just said Mr. Holland, where the knife at? And I told him I didn't have a knife and I went, I was explaining to him I was, I was explaining to him what happened and he kept yelling, hollering about where is the knife? Tell me where the knife at. That's all he was, that's all he kept saying.
Q Okay. When the detective spoke with you, what was your behavior like?
A I was calm. I was calm.
Q You were calm and you didn't swear at all?
A No.
Q Did the detective talk to Julia?
A Yeah. He talked to Julia, too.
Q For how long?
A I don't know how long.

Q Now, you indicated that Mrs. Parker, when they first were in line, was dropping stuff on the floor, --
A Yes.
Q -- you thought, to entice you?
A Yes.
Q After that incident of dropping three or four items on the floor, did she do anything else throughout the night that you perceived as being enticing with you?
A No, because after that, she went and sat down.
Q Okay. Just a moment, please.
MS. JOHNSON: Okay.
Q When you were hired in August 9, 2002, did you --
A Uh-huh.
MS. JOHNSON: Yes?
Q Yes? You have to say yes.
A Yes.
Q Did you know Sulema Atkins personally?
A Yes.
Q Okay. So before she hired you, you knew who she was?
A Yes.

Q Okay. And how well did you know Ms. Atkins?
A I knew her quite well because she was friends with both of my sisters.
Q Okay. She was friends with your sisters, so she knew about your problem with cocaine?
A Yes.
Q Okay. Did she know, as far as you know, did she know about your, any of your -- strike that. Did she know about your 1995 assault arrest?
A No.
MS. JOHNSON: Objection, foundation.
Q How well did Ms. Atkins know your sisters?
MS. JOHNSON: Objection, foundation.
A She know them pretty well because she worked with both of them.
Q Would they see each other socially?
A I think --
MS. JOHNSON: Objection, foundation. Go ahead.
A I think once, couple of times they had went out and she had came over and we had a little get-together, a picnic, cookout. She came over a couple of times.
Q Now, how is it that you think Ms. Atkins knew

about your cocaine problem?
A How?
Q Yeah. How do you think she knew?
MS. JOHNSON: Objection, foundation. Go ahead.
A For one, I never kept -- I don't lie to people. I never keep it from them.
Q Did she, did you tell her that?
A Yeah.
Q While you were interviewing?
A And then my sister, then she heard it from my sisters. And she tried, she was trying to help me, maybe support me.
Q What about Mr. Straybrooks, did he know about it? Is that his name?
MS. JOHNSON: Claybrooks.
Q Claybrooks.
A Curtis? No.
MS. JOHNSON: David.
Q David Claybrooks?
A Oh, David?
MS. JOHNSON: Yes.
A No.
Q And Curtis knew?
A No.

Q What about Mr. Reese, do you know who that is?
**A No, I don't know who Mr. Reese is.**
Q David Reese? Is that David Reese?
MS. JOHNSON: Steven.
Q Steve Reese, the Director of Operations?
**A I don't know.**
Q You don't know? Okay. All right. You were arrested that night and went off to jail?
**A Right.**
Q They emptied your pockets?
**A Right.**
Q After that day, you didn't return back to McDonald's at New York Ave. until a year later?
**A When I got arrested for?**
Q No. I'm sorry. You testified that you did 90 days for violating the probation?
**A Right.**
Q When you got out, you called the McDonald's?
**A No, before I got out.**
Q Before you got out?
**A I had my wife to keep my contact with because David Claybrooks was still at that time, was still the manager.**
Q Okay.

**A And I had her call --**
Q Okay. Under new ownership?
**A No. This before they sold. They were still there before and I had her to call him, ask him when I got out, was my job still secure? And he told her yes, as long as he was there, he was still there.**
Q Now, since the incident, who have you spoken to about what happened?
**A A lot of people.**
Q And who is that?
**A My friends, family.**
Q Other than your friends and family.
**A No one else. No. Only my friends and family.**
Q Did you speak to any representatives of McDonald's?
**A No.**
Q Have you spoken to Julia Carter about what happened?
**A I haven't seen her since I left McDonald's.**
Q Okay. Did you speak to Mr. Claybrooks about what happened?
**A I haven't seen him since he left.**
Q Okay. But when you went back there after you got out of prison --

**A He wasn't there.**
Q He wasn't?
**A No. It was a new store manager.**
Q Have you spoken to Steven Reese about what happened that day?
**A I don't know who Steven Reese is.**
Q Okay. Have you spoken to Ms. Johnson before today about what happened?
**A Yes.**
Q When was that?
**A Yesterday.**
Q I'm sorry?
**A Friday.**
Q Last Friday?
**A Yes.**
Q Okay. And where did you speak to her?
**A Here.**
Q You came here?
**A Yes.**
Q For how long were you here?
**A I think about 20, 30 minutes.**
Q Okay. And what did you discuss?
**A We discussed the incident that went on that night, what happened.**
Q Okay. And did you tell her what happened?

**A Yes.**
Q And did she make any recommendations to you?
**A Recommendations as far as?**
Q As far as what you needed to say or what you should say.
**A No.**
Q Okay. Did she explain what the lawsuit was about?
**A No.**
Q Okay. What did she say or do?
**A We talked about what happened between me and Mr. Parker that night, the incident that went on, and everything that was said that night that I got locked up.**
Q Okay. And what did Ms. Johnson say to you?
**A I'm not quite sure.**
Q Was anyone else here besides you and Ms. Johnson?
**A Yes. Detective Kelly.**
Q Detective who?
**A Kelly. Investigator Kelly.**
Q Investigator Kelly?
**A Yes.**
Q Okay. I think I know who that is. He's the person that found you, where you were --

A Yes.
Q -- and brought you to speak to Ms. Johnson?
A Yes.
Q Okay. All right. Doing good here. Last look. You started working in August of 2002 again for McDonald's at the New York Ave. store?
A Yes.
Q And then at some point in time after that, Julia Carter became a swing manager?
**A When she first started, she was a crew person.**
Q So she was there when you were there in August '02?
**A Yeah.**
Q She was a crew person just like yourself?
**A Yeah.**
Q Okay. And she became swing manager at some point in time after that?
**A Yes. She had to go, she went to class and everything for swing, swing manager class for that.**
Q Now, were you and her friends outside of work at that time?
**A No. When she started there, that was the first time we ever seen each other.**
Q And you didn't see each other outside of work

even as friends?
**A No.**
Q Okay. Do you know if she was aware of your cocaine use?
**A No. I had not really talked to her about my cocaine.**
Q Okay. At any time when she became swing manager, did she have to discipline you for any reasons?
**A Well, like I say, one time before that, female customer came in and I said to another crew person, you see how fat she is? And Julia turned around and was, like, George, that's not professional.**
Q When was that? Do you recall?
**A I'm going to say it was like a couple of months after she officially became a manager.**
Q Before your incident with the Parkers, had you ever had any other incidents with customers?
**A No. That was the first time I ever had an incident with a customer.**
Q Had you ever had any incidents with co-workers before that date?
**A No, because I get along with everybody and everybody know how funny, I mean, well, I'm not -- like, say, for instance, if I don't come to work, like**

**if I'm on my day off or whatever and then I come back the next day, they be, like, man, where you been? It's no fun without you because I laugh and crack jokes on everybody. I'm just a fun person to be around.**
MR. BUTLER: Okay. I think that's all the questions I have. Thank you, Mr. Holland.
THE WITNESS: You're welcome.
MS. JOHNSON: All right. Thank you, George. Now, I have no further questions of you.
THE WITNESS: Okay.
MS. JOHNSON: And thank you very much for coming down.
THE WITNESS: You're welcome.
MR. JOHNSON: Okay. We'll, we may have a trial in the case in which case, we'll get you another subpoena.
THE WITNESS: Okay.
MS. JOHNSON: And I'll send Mr. Kelly out to find you if you're not where we need to find you, okay?
THE WITNESS: Okay.
MS. JOHNSON: All right. So thank you so much.
THE WITNESS: You're welcome.

MS. JOHNSON: Bye-bye.
THE REPORTER: Do you want him to read and sign also?
MS. JOHNSON: Yes.
(Signature having been not been waived, the deposition of GEORGE HOLLAND was concluded at 6:04 p.m.)